Docket No. 91093–Agenda 33–September 2001.

JENNIFER SIMMONS 
et al.
, Appellants, v. ROLANDO M.

GARCES, M.D., Appellee.

Opinion filed January 25, 2002.

JUSTICE McMORROW delivered the opinion of the court:

In this appeal we are asked to determine whether the jury’s answer to a special interrogatory is incompatible with the jury’s general verdict, and, if so, whether the special interrogatory controls. A jury returned a general verdict in the amount of $675,000 against defendant Dr. Rolando M. Garces and in favor of plaintiffs Jennifer Simmons (Jennifer) and Harold King (Harold), who had brought a medical malpractice action against Dr. Garces following the death of their infant daughter, LaTonya King. The jury also answered “No” to the special interrogatory: “Did dehydration contribute to cause the death of LaTonya King?” As a result, in response to Dr. Garces’ post-trial motion, the circuit court of Cook County entered judgment in favor of Dr. Garces on the special interrogatory. 735 ILCS 5/2–1108 (West 2000). A divided appellate court affirmed, concluding that the jury’s answer to the special interrogatory was “absolutely irreconcilable with the general verdict” and the trial court therefore “properly entered judgment in favor of defendant.” 
319 Ill. App. 3d 308, 322. We allowed plaintiffs’ petition for leave to appeal. 188 Ill. 2d R. 315. For the reasons set forth below, we affirm the judgment of the appellate court.

BACKGROUND

LaTonya King
(footnote: 1) was born prematurely to Jennifer on December 28, 1993, and was hospitalized for two weeks thereafter. On January 21, 1994, Jennifer brought LaTonya to Dr. Garces’ clinic for a checkup. The child’s weight was five pounds, 12 ounces, and Dr. Garces pronounced her a perfectly healthy baby.

Dr. Garces practiced in a clinic at 7106 South Jeffery in Chicago, about a block and a half from Jennifer and Harold’s residence at 7234 South Jeffery. The clinic operated on a first-come, first-served basis. Patients would sign in when they entered the clinic, and would be seen by the doctor in that order. Dr. Garces had two assistants, Sharon Robinson (Sharon), a certified medical assistant, and Shalonda Sloan (Shalonda), an 18-year-old with no formal training in patient care. One of the responsibilities of the assistants was to notify the doctor if a patient presented an emergency. If that were the case, the doctor would see the patient out of turn.

Jennifer testified that LaTonya took her normal feeding of four ounces of formula on the night of January 23, 1994. The next morning, January 24
, Jennifer noticed loose stool in LaTonya’s diaper when the child awoke for her feeding. Jennifer denied at trial that LaTonya took four ounces of formula at this 6 a.m. feeding, but was impeached with her deposition testimony to the contrary. At 8:30 a.m. LaTonya took two ounces of water. However, she would not take her 10 a.m. feeding, and Jennifer became concerned. She called Dr. Garces’ clinic and spoke to the doctor, informing him of the situation, and he told her to switch to a formula called Pedialyte. Jennifer tried to feed LaTonya the Pedialyte, but the child would take only half an ounce.

At 12:30 p.m. Jennifer again telephoned the clinic and spoke to Sharon, who told her she should keep trying to get LaTonya to take the Pedialyte. Jennifer’s subsequent attempts to feed LaTonya the formula were unsuccessful. At that point Jennifer dressed the baby warmly and walked to the clinic, arriving at about 1 p.m. After about 15 minutes, Shalonda called Jennifer’s name and they went to a waiting area, where Jennifer told Shalonda that LaTonya was not sucking the bottle. Shalonda testified that she weighed and measured LaTonya, and wrote the child’s height, weight, temperature and head circumference in a temporary chart. She used a temporary chart because she was unable to retrieve LaTonya’s permanent chart. Shalonda then left the waiting area and went to speak to the doctor. According to Jennifer, when Shalonda returned, she told Jennifer that Dr. Garces wanted her to get some Pedialyte from a drug store. Jennifer then left the clinic and went across the street to the drug store, picked up the Pedialyte, and went home. She stated that she left the office because she was following the doctor’s orders to obtain the Pedialyte.

Jennifer tried repeatedly that afternoon to feed LaTonya the formula but to no avail. She called the clinic at 2:29 p.m. and at 2:53 p.m., each time speaking to Sharon, who told her to continue her efforts. During the second of these calls, Jennifer told Sharon that LaTonya was sleeping more. At 3:56 p.m. Jennifer called the clinic again and spoke to Dr. Garces, who told her to try a different formula and if that did not work, to take LaTonya to the emergency room. Dr. Garces said he was concerned that LaTonya might become dehydrated. Soon after, at about 4:13 p.m., Jennifer called a cab. She testified that she waited inside her apartment for it to arrive, dressed the baby warmly, and then took the cab to South Shore Hospital.

Dr. Thomas Bahk, an emergency room physician at South Shore, testified that LaTonya was dead when she arrived at the emergency room at about 4:40 p.m. She had no respiration, no blood pressure, and no pulse. He and the emergency room nurses performed cardiopulmonary resuscitation but were unable to revive her. She was pronounced dead at 5:06 p.m. on January 24, 1994.

Marcel Parungao, an emergency room nurse, testified that the baby’s rectal temperature at that time was 93.2 degrees Fahrenheit, and her weight was five pounds, eight ounces. He also found loose stool in her diaper. Myrna Carating, another nurse, testified that LaTonya was wearing a diaper and pajamas, and was wrapped in two receiving blankets that were “quite thin.” According to Carating, Jennifer told her that LaTonya had been active at 2:30 p.m. Carating also recorded that just prior to Jennifer’s and LaTonya’s arrival at the emergency room, LaTonya had stiffened, her arms had stretched, and her neck was hyperextended.

Chicago Police Officers Charles Howard and Paul Anderson went to the hospital on January 24 after receiving a call about LaTonya’s death. Anderson testified that Jennifer indicated she walked to the hospital. Howard gave essentially the same testimony, stating that a report prepared after they had gone to the scene indicated that Jennifer walked to the hospital on January 24. Under cross-examination, Howard and Anderson conceded that this report was not signed by a supervisor.

Between 5 and 6 p.m., Chicago police department Detectives John McMurray and David Friel were assigned to investigate LaTonya’s death. After arriving at the hospital, they interviewed hospital staff members as well as Jennifer and Harold. Friel stated that they learned from Jennifer that she arrived at the hospital by taxi. Friel and McMurray closed their investigation after determining that there had been no criminal wrongdoing.

Dr. Tae Lyong An, a forensic pathologist with the Cook County medical examiner’s office, conducted an autopsy. According to Dr. An, LaTonya’s death was caused by “dehydration due to gastroenteritis.” LaTonya had sunken eyeballs and poor skin turgor,
(footnote: 2) or tension, both of which, according to Dr. An, are consistent with dehydration. Under cross-examination, Dr. An conceded that premature babies can be born without fully developed subcutaneous tissue and fat, and thus could have sunken eyeballs without being dehydrated. In addition, premature infants can have excess skin that would appear wrinkly and have less tension. Dr. An also acknowledged that there was just a four-ounce difference between the weight recorded for LaTonya on January 21 (5 pounds, 12 ounces), and her weight on January 24 in the emergency room (5 pounds, 8 ounces). That is a weight loss of 4.4%, which Dr. An conceded would be unlikely to cause death by dehydration. He also acknowledged that his report included no finding of tubular necrosis in the kidneys, a condition that is consistent with death by severe dehydration, nor did he find any anatomic or pathologic evidence of inflammation in the stomach or small intestine, a condition that constitutes the definition of gastroenteritis. Dr. An explained that there is such a thing as “functional change of the intestine” which, though not anatomically found, can cause diarrhea. “We call it gastroenteritis,” he said. “That is nothing unusual.”

Dr. An also testified that he did not think there was any evidence of hypothermia as a possible cause of death. He said he had information that Jennifer took LaTonya to the hospital by taxi. He did not remember that Jennifer walked to the hospital.

Jennifer and Harold, acting individually and as co-special administrators of LaTonya’s estate, brought a wrongful-death action against Dr. Garces, alleging that LaTonya’s death was a proximate result of Dr. Garces’ negligence. Attached to the complaint was a physician’s report asserting that LaTonya “died from dehydration.”

Plaintiffs presented the expert testimony of Dr. Gilbert Given, a board-certified pediatrician, to establish that Dr. Garces deviated from the applicable standard of care and that his negligent conduct resulted in LaTonya’s death from dehydration. Dr. Given testified that, in his opinion, LaTonya “was severely dehydrated and this contributed to her death.” He said dehydration, which he defined as a loss of body fluids,
(footnote: 3) is determined by the percent of weight loss. A loss in body weight of more than 10% or 12% usually indicates severe dehydration. In such instances, the child’s circulation becomes involved, and the child may have lower blood pressure. According to Dr. Given, LaTonya was 12% to 14% dehydrated, based on a comparison of her weight on January 21, 1994 (5 pounds, 12 ounces), and her weight at autopsy, which Dr. Given said was about 5 pounds. The appropriate treatment in LaTonya’s case would have been “hospitalization and IV fluids.” Dr. Given opined that Dr. Garces’ failure to see LaTonya and intervene on January 24 amounted to negligence which contributed to the child’s death. According to Dr. Given, “more likely than not, if Dr. Garces had intervened with appropriate IV fluids [LaTonya] would not have died.”

On direct examination, Dr. Given was asked about inconsistencies in evidence he had reviewed. He responded that there were “numerous” inconsistencies, “[e]ven to the point of how the baby got to the hospital. It was noted by one officer that the mom took a cab. Someone else noted that the mom walked.”

Dr. Given conceded on cross-examination that the medical examiner’s report included no findings of tubular necrosis of the kidneys, nor did it include any findings of inflammation of the stomach, the large intestine or the small intestine. The report also did not mention the exact number of times LaTonya had diarrhea, nor did it describe LaTonya’s input of fluid prior to her death. As far as Dr. Given knew, no one made any determination as to the amount of fluids LaTonya took in or expelled “during this illness.”

He also acknowledged that he did not know to a reasonable degree of medical certainty the exact extent of the dehydration that LaTonya suffered. “How dehydrated the child, the baby, was, I don’t know,” Dr. Given said.

Dr. Garces denied that he was negligent, and denied that any claimed act or omission on his part was a proximate cause of plaintiffs’ claimed injuries. He presented expert testimony to establish that LaTonya’s death was not caused by dehydration but rather that it resulted from hypothermia, or possibly from suffocation.

Dr. Michael Kaufman, who was certified in anatomic pathology and cytopathology, testified that he found no significant evidence in the medical records or the autopsy report to indicate that LaTonya died from dehydration. He opined instead that the cause of death was hypothermia, or possibly suffocation. He noted that LaTonya’s weight had changed by only 4.4% from January 21 until the time she was weighed in the emergency room on January 24 “just at the point of death.” Such a weight loss, he said, is “insignificant” and insufficient to cause or contribute to cause death by dehydration.

Dr. Kaufman also noted that there was no indication of any elevation in the levels of blood urea nitrogen, sodium or creatinine. This, he said, was inconsistent with death due to dehydration. In addition, the gross and microscopic findings in the autopsy report showed no evidence of gastroenteritis. The autopsy report also included no reference to any findings of acute tubular necrosis, which Dr. Kaufman said was inconsistent with severe dehydration.

According to Dr. Kaufman, the most likely cause of death was hypothermia. He noted that LaTonya’s temperature as recorded in the emergency room on January 24 was 93.2 degrees, which he termed “markedly depressed.” In order for death to result from hypothermia, which is defined as a subnormal body temperature, it must be of a significant enough degree that it alters the normal body metabolism and creates an abnormal heart rhythm. Dr. Kaufman said he found nothing in LaTonya’s autopsy report that was inconsistent with a death by hypothermia.

Dr. William Wittert, a board-certified pediatrician, also testified for the defense. Dr. Wittert opined that LaTonya did not die of dehydration. He noted that, according to the record testimony, LaTonya took four ounces of fluid between 9 and 10 p.m. on January 23, another four ounces at 6 a.m. on January 24, and two ounces at 8:30 a.m., plus a half ounce of Pedialyte later in the morning. At the same time, there were only two references to output in terms of stool: the loose stool that Jennifer said she found in the diaper at 6 a.m., and the loose stool found in LaTonya’s diaper at the emergency room. According to Dr. Wittert, these inputs and outputs of fluid are inconsistent with dehydration. He noted, in addition, that LaTonya’s weight loss from January 21 to January 24 was only four ounces, or about 4.34%. Such a weight loss could represent mild dehydration but is not life-threatening. Even if the weight loss were as high as 10%, “babies should not die from that level of dehydration.”

As to other possible causes of LaTonya’s death, Dr. Wittert said he did not have an opinion to a reasonable degree of medical certainty as to what caused her death. However, he pointed to the child’s 93.2 degree temperature, which he described as “very low.” Most babies, he said, would probably survive that temperature, but LaTonya was small and preterm, and in her case this temperature might have contributed to or caused her death. He also said the child might have suffocated.

Dr. Wittert also opined that Dr. Garces and his staff possessed the requisite skill and met the applicable standard of care in this case. According to Dr. Wittert, nothing that Dr. Garces did caused harm to LaTonya.

The instructions to the jury stated plaintiffs’ claims as follows: Dr. Garces was negligent on the day of LaTonya’s death by (a) failing to examine LaTonya after Jennifer brought her to the clinic when he should have known that the child was experiencing diarrhea, drowsiness, and the inability to suck;
(footnote: 4) (b) failing to follow up by taking phone calls from Jennifer, when he should have known of LaTonya’s symptoms; (c) failing to refer LaTonya to a physician or hospital for examination, diagnosis, or IV treatment when he knew or should have known of her symptoms; or (d) permitting his staff to provide inappropriate medical advice or decisions over the phone. The jury was instructed that it must not decide the question of professional negligence based on personal experience but only from expert testimony.

The parties disagreed as to which instruction should be given for proximate cause, with plaintiffs arguing for the long form of Illinois pattern instruction No. 15.01, and defendant urging the short form. See Illinois Pattern Jury Instructions, Civil, No. 15.01 (2000). The trial court agreed to give the long form, which stated that:

“When I use the expression ‘proximate cause,’ I mean any cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury.” Illinois Pattern Jury Instructions, Civil, No. 15.01 (2000).

Once the court agreed to give the long-form instruction, defendant argued that a special interrogatory was needed in order for the jury to determine specifically whether dehydration caused LaTonya’s death. According to defendant’s counsel, if the jury determined that dehydration was not involved in LaTonya’s death, then Dr. Garces could not be liable because “[t]hat’s their whole case.”

Plaintiffs’ counsel objected, arguing that the jury had heard evidence of a variety of causes of death, and that it would be prejudicial to plaintiffs to “make it very narrow” with this special interrogatory. According to counsel, the jury might think that LaTonya’s death was the result of a combination of causes. The court asked, “What if they think it’s suffocation?” Plaintiffs’ counsel answered: “[I]f [the jurors] think it’s suffocation, there’s been no testimony from the plaintiffs that suffocation would make the doctor responsible, so they wouldn’t even get to this. They would be on Verdict Form B [in favor of Dr. Garces].”

The court suggested that a more appropriate interrogatory to test the jury’s verdict would be: “Did dehydration contribute to cause the death of LaTonya King?” The court gave this interrogatory over plaintiffs’ objection.

During their deliberations, the jury sent out a note asking three questions:

“(1) If we have already decided on Form A or Form B, what is the purpose of the dehydration form?

(2) Is the dehydration form mandatory?

(3) Do we have to be unanimous on the dehydration form?”

The court’s response to the first question was: “It is the law.” The court answered “Yes” to both the second and third questions.

A short time later, the jury returned its verdict, finding in favor of plaintiffs in the amount of $675,000. The jury answered the special interrogatory in the negative. Defense counsel moved for entry of judgment in favor of Dr. Garces on the basis of the inconsistency.

After allowing the parties to brief the issue, the court entered judgment on the special finding in favor of defendant, rejecting plaintiffs’ argument that the jury’s special finding was not absolutely irreconcilable with the general verdict. The court stated:

“[P]laintiffs concede their liability expert determined that dehydration at least contributed to LaTonya’s death. The plaintiffs during the trial presented only one causation expert and no other theory or mechanism for death that was independent of dehydration. This Court finds that the special finding was absolutely irreconcilable with the general verdict.”

Plaintiffs appealed, and the appellate court affirmed. In reaching this decision, the appellate court stated:

“Plaintiffs presented no expert testimony to establish any other causation of death but dehydration. ***

When the jury was asked to focus its attention on the particularized question of whether dehydration contributed to cause LaTonya’s death, it answered ‘No.’ Plaintiffs’ attempt to establish a causal connection between defendant’s negligence and LaTonya’s death then failed for lack of expert testimony.

*** [T]here is no reasonable hypothesis remaining on which to reconcile the jury’s answer to the special interrogatory with the general verdict. The trial court properly entered judgment on the special interrogatory.” 319 Ill. App. 3d at 317-18.

We allowed plaintiffs’ petition for leave to appeal. 188 Ill. 2d R. 315.

ANALYSIS

Plaintiffs’ main argument before this court is that the jury’s special finding was not irreconcilable with the general verdict, and therefore the trial court should have entered judgment on the general verdict and not on the special finding. According to plaintiffs, the central issue here is not whether LaTonya died of dehydration, but rather whether Dr. Garces was negligent and whether his negligence was a proximate cause of LaTonya’s death. Plaintiffs contend that regardless of the medical cause of death, LaTonya would be alive today were it not for Dr. Garces’ negligence in failing to examine LaTonya and refer her to an emergency room in the early afternoon on January 24
. Thus it was not inconsistent for the jury to find Dr. Garces liable for LaTonya’s death and at the same time conclude that dehydration did not contribute to cause her death. Plaintiffs argue in the alternative that the jury’s special finding was against the manifest weight of the evidence. They also contend that the special interrogatory should not have been given because it was confusing and not in proper form.

Plaintiffs additionally point to various instances of alleged misconduct on the part of defense counsel that they assert deprived them of a fair trial. They also claim that the trial court erred in admitting certain evidence and barring other evidence, and in refusing to give a missing-evidence instruction.

Special interrogatories are governed by section 2–1108 of the Code of Civil Procedure, which states:

“Unless the nature of the case requires otherwise, the jury shall render a general verdict. The jury may be required by the court, and must be required on request of any party, to find specially upon any material question or questions of fact submitted to the jury in writing. Special interrogatories shall be tendered, objected to, ruled upon and submitted to the jury as in the case of instructions. Submitting or refusing to submit a question of fact to the jury may be reviewed on appeal, as a ruling on a question of law. When the special finding of fact is inconsistent with the general verdict, the former controls the latter and the court may enter judgment accordingly.” 735 ILCS 5/2–1108 (West 2000).

A special interrogatory serves “as guardian of the integrity of a general verdict in a civil jury trial.” 
O’Connell v. City of Chicago
, 285 Ill. App. 3d 459, 460 (1996). It tests the general verdict against the jury’s determination as to one or more specific issues of ultimate fact. 
Noel v. Jones
, 177 Ill. App. 3d 773, 783 (1988); 
Gasbarra v. St. James Hospital
, 85 Ill. App. 3d 32, 38 (1979). A special interrogatory is in proper form if (1) it relates to an ultimate issue of fact upon which the rights of the parties depend, and (2) an answer responsive thereto is inconsistent with some general verdict that might be returned. 
Noel
, 177 Ill. App. 3d at 783; 
Gasbarra
, 85 Ill. App. 3d at 38. Special findings are inconsistent with a general verdict only where they are “clearly and absolutely irreconcilable with the general verdict.” 
Powell v. State Farm Fire & Casualty Co.
, 243 Ill. App. 3d 577, 581 (1993). If a special interrogatory does not cover all the issues submitted to the jury and a “reasonable hypothesis” exists that allows the special finding to be construed consistently with the general verdict, they are not “absolutely irreconcilable” and the special finding will not control. 
Powell
, 243 Ill. App. 3d at 581. In determining whether answers to special interrogatories are inconsistent with a general verdict, all reasonable presumptions are exercised in favor of the general verdict. 
Bilderback v. Admiral Co.
, 227 Ill. App. 3d 268, 270 (1992).

We conclude that the jury’s special finding in the instant case is “absolutely irreconcilable” with the general verdict. As noted, the jury answered “No” to the special interrogatory: “Did dehydration contribute to cause the death of LaTonya King?” Plaintiffs based their entire case on the theory that Dr. Garces’ negligence caused LaTonya’s death by allowing her to become severely dehydrated. If, as the jury concluded, dehydration did not contribute to cause LaTonya’s death, then the necessary link between Dr. Garces’ alleged negligence and LaTonya’s death is missing, and he could not be found liable. The special finding thus is irreconcilable with the general verdict in favor of plaintiffs and against Dr. Garces.

As in every negligence case, plaintiffs here needed to establish more than the standard of care and a deviation from that standard. They also were required to show a casual connection between the deviation and the injury, in this case LaTonya’s death. 
Evanston Hospital v. Crane
, 254 Ill. App. 3d 435, 441 (1993). In a medical malpractice case, proximate cause must be established by expert testimony to a reasonable degree of medical certainty. 
Aguilera v. Mount Sinai Hospital Medical Center
, 293 Ill. App. 3d 967, 972 (1997); accord 
Townsend v. University of Chicago Hospitals
, 318 Ill. App. 3d 406, 413 (2000).

Plaintiffs here presented the testimony of one expert, Dr. Given, who opined that LaTonya was severely dehydrated and that this contributed to her death. According to Dr. Given, it was more likely than not that LaTonya would have survived if Dr. Garces had intervened with appropriate IV fluids.

As the appellate court below correctly noted, plaintiffs presented no expert testimony establishing any cause of death other than dehydration. In addition, while defendant’s experts did suggest other possible causes, 
i.e.
, hypothermia and suffocation, plaintiff’s attorney disputed these theories in closing argument. Moreover, the trial record reveals no expert testimony establishing that Dr. Garces would have been to blame if LaTonya died from either of these other causes. Plaintiffs’ counsel conceded as much when, in arguing against the giving of the special interrogatory, he stated that if the jury thought LaTonya died of suffocation, “there’s been no testimony from the plaintiffs that suffocation would make the doctor responsible, so [the jurors] wouldn’t even get to this. They would be on verdict form B [in favor of Dr. Garces].” Absent expert testimony linking Dr. Garces’ conduct to death by hypothermia or suffocation, and given the jury’s rejection of dehydration as a cause of death, there is no reasonable hypothesis remaining on which to reconcile the jury’s special finding with the general verdict.

Notwithstanding the foregoing, plaintiffs argue that it does not matter whether LaTonya died of dehydration or some other specific medical cause. What is important, they contend, is that LaTonya was ill and Dr. Garces failed to examine and treat her accordingly, thus proximately causing her death. Hence there is no inconsistency between the jury’s finding that dehydration was not a cause of LaTonya’s death, and the general verdict in favor of plaintiffs and against Dr. Garces. Plaintiffs assert that:

“It is irrefutable that had Dr. Garces seen LaTonya and referred her to an emergency room for care as he should have in the early afternoon [of January 24
], she would be alive today. The hypothermia and suffocation speculation about the medical cause of death that the defense presented does not make a difference in a legal causation analysis; had proper care been given, LaTonya would not have been in a position to become hypothermic or have accidentally suffocated.”

The gist of this argument appears to be that, regardless of the specific cause of death, Dr. Garces had a duty to examine LaTonya and refer her to an emergency room for care. If LaTonya had been sent to an emergency room in the early afternoon on January 24, she would not have been in a position to become hypothermic or suffocate on the way to the hospital later that day.

This argument lacks merit. It is well settled that two distinct requirements must be met in order to establish proximate cause. The defendant’s conduct must be shown to be an actual cause of the plaintiff’s injury, and it must be a legal cause as well. 
Lee v. Chicago Transit Authority
, 152 Ill. 2d 432, 455 (1992); 
Nelson v. Thomas
, 282 Ill. App. 3d 818, 828 (1996). Actual cause, or cause in fact, can be established only where “there is a reasonable certainty that a defendant’s acts caused the injury or damage.” 
Lee
, 152 Ill. 2d at 455. A defendant’s acts are a 
legal
 cause only if they are “so closely tied to the plaintiff’s injury that he should be held legally responsible for it.” 
McCraw v. Cegielski
, 287 Ill. App. 3d 871, 873 (1996). A determination as to legal cause is “a policy decision that limits how far a defendant’s legal responsibility should be extended for conduct that, in fact, caused the harm.” 
Lee
, 152 Ill. 2d at 455.

In the instant case, even if we were to conclude, which we do not, that Dr. Garces’ failure to examine LaTonya and refer her to an emergency room was an actual cause of LaTonya’s death, this would not establish that his conduct proximately caused her death. It would still have to be shown that Dr. Garces’ conduct was a legal cause. However, this cannot be so, given the facts in this case. As noted, the only cause of death linked by expert testimony to Dr. Garces’ conduct was dehydration. See 
Aguilera
, 293 Ill. App. 3d at 972; 
Townsend
, 318 Ill. App. 3d at 413. Accordingly, if the cause of death were anything other than dehydration, Dr. Garces could not be held legally responsible. The link to his conduct would simply be too attenuated to support a judgment of liability. 
Cf. Lee
, 152 Ill. 2d at 455; 
McCraw
, 287 Ill. App. 3d at 873.

Plaintiffs rely upon 
Cohen v. Sager
, 2 Ill. App. 3d 1018 (1971), and 
Bilderback v. Admiral Co.
, 227 Ill. App. 3d 268 (1992), for support of their contention that the special interrogatory in the instant case was not irreconcilable with the general verdict. In both 
Cohen 
and 
Bilderback
, a general verdict was found to have addressed issues not covered by special findings, and there was thus no inconsistency. Plaintiffs’ reliance upon these cases is misplaced.

In 
Cohen
, the plaintiff claimed she suffered injuries when the automobile in which she was a passenger was struck by the defendant’s vehicle. The jury returned a general verdict in favor of the defendant, but found in response to special interrogatories that inclement weather and icy conditions were not the proximate cause of the accident, and that the defendant was guilty of negligence that contributed to cause the accident. The trial court entered judgment in favor of the plaintiff on the special findings, which it ruled were inconsistent with the general verdict. The appellate court reversed, holding that the special findings “did not exclude every reasonable hypothesis consistent with the general verdict” (
Cohen
, 2 Ill. App. 3d at 1020), and there was thus no inconsistency. According to the court, the jury could have found, consistent with the general verdict, that “while the defendant was negligent in causing the collision, no injury was suffered or that [the plaintiff’s] injury was not proximately caused by the defendant’s negligence.” 
Cohen
, 2 Ill. App. 3d at 1021.

In 
Bilderback
, where the plaintiff alleged that he was fired in retaliation for seeking workers’ compensation benefits, the jury returned a general verdict in favor of the plaintiff, but found in response to special interrogatories that his discharge had been recommended and authorized on the belief that the plaintiff had shoved a supervisor and given false information to the company nurse. The trial court agreed with the defendant that the special findings were inconsistent with the general verdict, and it therefore entered judgment in favor of the defendant. The appellate court reversed, holding that the general verdict addressed an issue that was not determined by the special findings, and there was thus no inconsistency. According to the court, the jury found in its general verdict that the actual reason for the plaintiff’s discharge was that he was pursuing workers’ compensation benefits. There were no special interrogatories asking this specific question, and the interrogatories that 
were
 given “d[id] not establish that anything else was the actual reason” for the discharge. 
Bilderback
, 227 Ill. App. 3d at 271.

In the instant case, unlike 
Cohen
 and 
Bilderback
, the issue addressed by the special interrogatory was not peripheral but rather was an ultimate question of fact upon which the rights of the parties depended: “Did dehydration contribute to cause the death of LaTonya King?” See 
Noel
, 177 Ill. App. 3d at 783. Because dehydration was the only cause of death linked by expert testimony to Dr. Garces’ conduct, the jury’s negative answer to this interrogatory effectively eliminated any other “reasonable hypothesis” that might have reconciled the special finding with the general verdict. See 
Powell
, 243 Ill. App. 3d at 581. The special finding removed from consideration the only cause of death that, based on the evidence presented at trial, could be proximately connected to Dr. Garces’ conduct. Any other basis for the general verdict postulating a different cause or causes would lack the requisite causal connection to Dr. Garces. The general verdict and the special finding in the instant case are absolutely irreconcilable.

Plaintiffs argue in the alternative that the special interrogatory is against the manifest weight of the evidence. According to plaintiffs, the evidence in support of dehydration as the cause of death was “overwhelming,” and “[n]o other legitimate explanations for LaTonya’s death were submitted to the jury.” We disagree.

“ ‘A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence.’ ” 
Maple v. Gustafson
, 151 Ill. 2d 445, 454 (1992), quoting 
Villa v. Crown Cork & Seal Co.
, 202 Ill. App. 3d 1082, 1089 (1990). In the instant case, contrary to plaintiffs’ contentions, there was ample expert testimony to support the special finding that dehydration did not contribute to cause LaTonya’s death.

Dr. Kaufman, one of defendant’s experts, testified that he found no significant evidence in the medical records or the autopsy report to indicate that LaTonya died of dehydration. He noted that LaTonya’s weight had dropped by only 4.4% from January 21 until the time she was weighed in the hospital emergency room on January 24 “just at the point of death.” Such a weight loss, he said, is “insignificant” and insufficient to cause or contribute to cause death by dehydration. In addition, there was no indication of any elevation in the levels of blood urea nitrogen, sodium or creatinine. This, Dr. Kaufman said, was inconsistent with death due to dehydration. The gross and microscopic findings in the autopsy report showed no evidence of gastroenteritis, which Dr. An, the medical examiner, asserted had led to dehydration in this case. The autopsy report also included no findings of acute tubular necrosis, which Dr. Kaufman said was inconsistent with severe dehydration.

Dr. Kaufman’s testimony also provided an alternative cause of death, hypothermia, that was unrelated to defendant’s alleged negligence. Dr. Kaufman noted that LaTonya’s temperature as recorded in the emergency room on January 24 was 93.2 degrees, which he described as “markedly depressed.” He said he found nothing in LaTonya’s autopsy report that was inconsistent with death by hypothermia.

Dr. Wittert, another of defendant’s experts, stated that “[t]his child did not die from dehydration.” He noted that, according to the record testimony, LaTonya took in some 10½ ounces of fluid during the period prior to her death, but there were only two references to output in terms of stool: the loose stool in her diaper at 6 a.m. on January 24, and the loose stool found in her diaper later in the day at the emergency room. According to Dr. Wittert, these inputs and outputs of fluid were inconsistent with dehydration. He also testified that the weight loss recorded for her between January 21 and January 24 could represent mild dehydration but was not life-threatening. Even if the weight loss were as high as 10%, Dr. Wittert said, “babies should not die from that level of dehydration.”

Plaintiffs’ expert, Dr. Given, conceded on cross-examination that the medical examiner’s report included no findings of tubular necrosis, nor did it include any findings of inflammation of the stomach, the large intestine or the small intestine. He also conceded that he did not know, to a reasonable degree of medical certainty, the exact extent of the dehydration that LaTonya suffered.

The jury had ample expert evidence on which to base a special finding that dehydration did not contribute to cause LaTonya’s death. Given this evidence, we cannot say that the opposite conclusion was clearly evident, or that the special finding was unreasonable, arbitrary, and not based upon any of the evidence. See 
Maple
, 151 Ill. 2d at 454. We agree with the trial and appellate courts below that the special finding here was not against the manifest weight of the evidence.

 Plaintiffs also contend that the special interrogatory should not have been given in the first instance because it was confusing and not in proper form. Again, we disagree.

As noted, a special interrogatory is in proper form if (1) it relates to an ultimate issue of fact upon which the rights of the parties depend, and (2) an answer responsive thereto is inconsistent with some general verdict that might be returned. 
Noel
, 177 Ill. App. 3d at 783; 
Gasbarra
, 85 Ill. App. 3d at 38. In addition, it should be a single question, stated in terms that are simple, unambiguous, and understandable; it should not be repetitive, confusing, or misleading. 
Snyder v. Curran Township
, 281 Ill. App. 3d 56, 61 (1996). It need not contain all of the elements of negligence and is proper if it focuses on one element that is dispositive of the claim. 
Snyder
, 281 Ill. App. 3d at 60-61. A special interrogatory is to be read in context with the court’s other instructions to determine how it was understood and whether the jury was confused. 
LaPook v. City of Chicago
, 211 Ill. App. 3d 856, 866 (1991); 
Morton v. City of Chicago
, 286 Ill. App. 3d 444, 451 (1997). A trial court may not conclude from the mere fact of inconsistency between a general verdict and a special interrogatory that the jury was confused by the interrogatory. 
Blakey v. Gilbane Building Corp.
, 303 Ill. App. 3d 872, 882 (1999). To do so would nullify the provision of section 2–1108 of the Code of Civil Procedure (735 ILCS 5/2–1108 (West 2000)) that states that a special interrogatory controls where there is inconsistency. 
Blakey
, 303 Ill. App. 3d at 882, citing 
Borries v. Z. Frank, Inc.
, 37 Ill. 2d 263, 266 (1967).

The special interrogatory in the instant case is in proper form and is not confusing. It asks a single, straightforward question relating to an ultimate issue of fact upon which the rights of the parties depend: whether dehydration contributed to cause LaTonya’s death.

Interrogatories similar to that in the instant case were upheld in 
Costa v. Dresser Industries, Inc.
, 268 Ill. App. 3d 1 (1994), and 
Bluestein v. Upjohn Co.
, 102 Ill. App. 3d 672 (1981). In 
Costa
, the plaintiff claimed that her husband died of mesothelioma as a result of exposure to asbestos-containing products manufactured, sold or used by the defendants. The jury, which found in favor of the defendants, answered “No” to this special interrogatory: “Do you find that Dominic Costa died from the disease of mesothelioma?” The court in 
Costa
 found no error in the giving of this interrogatory. The plaintiff’s entire case was based on the claim that her husband died of mesothelioma as a result of asbestos exposure. Thus, a special finding that he did not die of mesothelioma was dispositive of the plaintiff’s claim.

In 
Bluestein
, the plaintiff sought damages for injuries allegedly resulting from his ingestion of Cleocin, a drug manufactured by the defendant. The jury returned a general verdict in favor of the plaintiff, but answered “No” to a special interrogatory asking whether Cleocin was a proximate cause of the plaintiff’s injuries. Because of this answer, the trial court entered judgment in favor of the defendant. The reviewing court in 
Bluestein
 affirmed, concluding that the jurors’ answer to the special interrogatory “reflected their acceptance of [the defendant’s] argument that the plaintiff was suffering from a disease that was completely unrelated to his ingestion of Cleocin.” 
Bluestein
, 102 Ill. App. 3d at 676.

In the instant case, as in 
Costa
 and 
Bluestein
, the special interrogatory asked a single question relating to an ultimate issue of fact that was dispositive of plaintiffs’ claim. The interrogatory was proper.

Plaintiffs, however, cite to 
Blakey v. Gilbane Building Corp.
, 303 Ill. App. 3d 872, 881-82 (1999), where an inconsistent special finding was held to be misleading because, 
inter alia
, it used a term, “sole proximate cause,” that had not been defined for the jury. According to plaintiffs, the situation in the instant case is similar: the trial court did not define “dehydration,” which is perhaps the key term in the special interrogatory. Plaintiffs therefore claim that “[i]t is understandable that the jury had difficulty comprehending the special interrogatory.”

We find no merit in this argument. Plaintiffs’ expert, Dr. Given, defined dehydration, as did every other physician who testified at trial. As the appellate court below correctly noted, “although the court did not define the term ‘dehydration,’ dehydration was extensively discussed and defined through expert testimony. The jury did not consider the special interrogatory without having heard extensive testimony on the subject.” 319 Ill. App. 3d at 319.

Plaintiffs also point to the questions that the jury asked about the special interrogatory as evidence that they were confused. As noted, after the jurors began deliberations, they sent out a note asking these questions:

“(1) If we have already decided on Form A or Form B, what is the purpose of the dehydration form?

(2) Is the dehydration form mandatory?

(3) Do we have to be unanimous on the dehydration form?”

The court’s answer to the first question was: “It is the law,” and it answered “Yes” to the second and third questions.

We agree with the trial and appellate courts that the questions asked by the jury do not reflect confusion. As the appellate court noted: “The questions regarded procedure. The jury did not appear confused about the actual question posed in the special interrogatory.” 319 Ill. App. 3d at 319.

Construing Dr. Garces’ special interrogatory in conjunction with the proximate-cause instructions given by the trial court, we find no reason to conclude that the interrogatory was unclear or that the jury was confused by it. See 
LaPook
, 211 Ill. App. 3d at 866; 
Morton
, 286 Ill. App. 3d at 451. The special interrogatory was in proper form, and it fulfilled its intended function of serving as a check on the jury’s general verdict. See 
Noel
, 177 Ill. App. 3d at 783; 
Gasbarra
, 85 Ill. App. 3d at 38.

Plaintiffs additionally point to various instances of alleged misconduct on the part of defense counsel that they assert deprived them of a fair trial. They also claim that the trial court erred in admitting certain evidence and barring other evidence, and that these alleged errors unfairly tainted the proceedings. In addition, plaintiffs contend that the trial court’s refusal to give a missing-evidence instruction unfairly prejudiced them.

After a careful review of the record, we conclude that none of these alleged errors or instances of alleged misconduct prevented plaintiffs from receiving a fair trial. Any error that might have occurred did not affect the outcome of the case. See 
Lawson v. G.D. Searle & Co.
, 64 Ill. 2d 543, 559 (1976) (plaintiff not entitled to absolutely error-free trial). “ ‘Where it appears that an error did not affect the outcome below, or where the court can see from the entire record that no injury has been done, the judgment or decree will not be disturbed.’ ” 
Lawson
, 64 Ill. 2d at 559, quoting 
Both v. Nelson
, 31 Ill. 2d 511, 514 (1964). Here the jury returned a substantial ($675,000) general verdict in plaintiffs’ favor. Plaintiffs were not unfairly prejudiced. See 
McDonnell v. McPartlin
, 192 Ill. 2d 505, 534-35 (2000).

With regard to the allegations of misconduct, plaintiffs contend that defendant’s counsel (1) demeaned the requirements for bringing suit, (2) were untruthful about defendant’s requesting a jury trial and other matters, (3) exaggerated plaintiffs’ burden of proof, (4) flauted prior court rulings by, 
e.g.
, commenting on Harold’s absence from the courtroom, (5) made improper comments about how long the trial was taking, (6) violated Supreme Court Rule 213(g) (177 Ill. 2d R. 213(g)) by eliciting improper testimony during direct examination of Dr. Wittert, one of defendant’s experts, and (7) made improper pleas for sympathy for the defense.

We note initially that in the majority of the instances cited by plaintiffs, the court either sustained counsel’s objection or granted appropriate relief such as striking a comment or an answer. In these instances, then, any potential error was cured. See 
Diaz v. Kelley
, 275 Ill. App. 3d 1058, 1066 (1995). At other times, plaintiffs’ counsel failed to object in a timely manner. In these instances, plaintiffs’ objections thus were waived. See 
Diaz
, 275 Ill. App. 3d at 1072; 
Golden v. Kishwaukee Community Health Services Center, Inc.
, 269 Ill. App. 3d 37, 49 (1994). The trial court also overruled some of the objections of plaintiffs’ counsel, but these rulings were well within the court’s discretion, and, as noted, did not affect the outcome of the case. See 
Taluzek v. Illinois Central Gulf R.R. Co.
, 255 Ill. App. 3d 72, 83 (1993) (evidentiary rulings will not be overturned absent a clearly evident abuse of discretion; in order to warrant reversal, error must have been substantially prejudicial and affected the outcome of the case); see also 
King v. American Food Equipment Co.
, 160 Ill. App. 3d 898, 911 (1987) (abuse of discretion may be found only where no reasonable person would take the view adopted by the trial court), quoting 
In re Marriage of Asch
, 100 Ill. App. 3d 293, 296 (1981).

Moreover, many of these claims of alleged misconduct came during opening statement or closing argument. Questions as to the prejudicial effect of remarks made during opening statement and closing argument are within the discretion of the trial court, and determinations as to such questions will not be overturned absent a clear abuse of discretion. 
Rockwood v. Singh
, 258 Ill. App. 3d 555, 558 (1993); 
Magna Trust Co. v. Illinois Central R.R. Co.
, 313 Ill. App. 3d 375, 395 (2000); 
Sawicki v. Kim
, 112 Ill. App. 3d 641, 645 (1983). In determining whether there has been an abuse of discretion, we may not substitute our judgment for that of the trial court, or even determine whether the trial court exercised its discretion wisely. 
Griffith v. Mitsubishi Aircraft International, Inc.
, 136 Ill. 2d 101, 115 (1990). We do not find an abuse of discretion here. The trial court properly informed the jury that opening statements and closing arguments were not evidence.

Plaintiffs also contend that the trial court erred in admitting evidence as to whether Jennifer took a taxi or walked to South Shore Hospital. Plaintiffs moved 
in limine
 to bar this evidence, arguing that it was collateral. According to plaintiffs, defendant’s experts indicated in their depositions that this issue was irrelevant to their opinions. Defendant, on the other hand, argued that the issue was relevant to Jennifer’s credibility, asserting that she told an emergency room nurse and the initial investigating officers that she walked, but later told detectives that she took a taxi. The trial court denied plaintiffs’ motion to bar this evidence.

As the appellate court correctly noted, plaintiffs have waived this issue for review. They failed to object when Dr. An, the medical examiner, gave testimony on this matter. Under cross-examination, Dr. An testified that he had information that Jennifer took LaTonya to the hospital by taxi, and he did not remember her walking. The denial of a motion 
in limine
 does not in itself preserve an objection to disputed evidence that is introduced later at trial. “When a motion 
in limine
 is denied, a contemporaneous objection to the evidence at the time it is offered is required to preserve the issue for review.” 
Brown v. Baker
, 284 Ill. App. 3d 401, 406 (1996). Plaintiffs made no such objection here.

Moreover, plaintiffs’ counsel elicited testimony on this issue from Dr. Given on direct examination. When asked about inconsistencies in evidence he had reviewed, Dr. Given stated that there were numerous inconsistencies, “[e]ven to the point of how the baby got to the hospital. It was noted by one officer that the mom took a cab. Someone else noted that the mom walked.” Thus, as the appellate court noted, plaintiffs not only failed to object at trial, but introduced the evidence themselves. They cannot now complain that the trial court erred in admitting the evidence. 
Reid v. Sledge
, 224 Ill. App. 3d 817, 822 (1992).

Plaintiffs next argue that the trial court erred in striking the testimony of Chicago Police Sergeant John McMurray, who in January 1994 was one of the detectives who investigated LaTonya’s death. During his testimony, McMurray stated that he had learned from Officers Charles Howard and Paul Anderson that they had erroneously put in their report that Jennifer walked to the hospital. This report was the only one from Officers Howard and Anderson that the trial court had allowed in evidence. A second report indicated that she took a cab, but this report did not surface until after the trial had begun, and the trial court therefore had ordered it barred. McMurray’s testimony indirectly brought in the issue of this second report, and the trial court stated that this testimony thus was a violation of the previous order. The trial court also stated that McMurray’s testimony violated another order with respect to unidentified persons who allegedly gave him information about how Jennifer arrived at the hospital. On defendant’s motion, the trial court struck McMurray’s entire testimony, which took up 34 pages in a trial transcript that totaled nearly 2,000 pages.

As noted, it is within the discretion of the trial court to make evidentiary rulings, and these determinations are not to be overturned absent a clear abuse of discretion. 
Taluzek
, 255 Ill. App. 3d at 83. We cannot say that there was such an abuse of discretion here. Even if there were some error, it was harmless. Plaintiffs were able to introduce some of the main elements in McMurray’s testimony through Chicago Police Detective David Friel, who was McMurray’s partner in the investigation of LaTonya’s death. Friel testified, as did McMurray, that he learned that Jennifer arrived at the hospital by taxi, and that they closed their investigation by determining that there was no apparent criminal wrongdoing in LaTonya’s death. Plaintiffs were not unfairly prejudiced by the striking of McMurray’s testimony. See 
McDonnell
, 192 Ill. 2d at 534-35.

Plaintiffs argue in addition that the defense was able to “soil” their case by introducing evidence to the effect that Jennifer and Harold were told to hire a lawyer and that they then changed their story about how Jennifer arrived at the hospital. Only two of the instances cited by plaintiffs took place before the jury. In the first, which came during closing argument, defendant’s counsel stated that:

“[Jennifer] tells half the people that she walked, and you heard two Chicago police officers get up on that witness stand and say, I learned that she walked. *** Someone around that emergency room said, get a lawyer. And then you hear a later version by some later arriving detectives who say the story really sounds better, if you’re going to sue someone, let’s make it a cab.”

Plaintiffs’ counsel objected, and the court responded by reminding the jury that closing arguments are not evidence. The court told the jury: “You’ve heard the evidence. Rely on your collective memory of what the evidence is.”

“The scope and character of closing argument are left to the discretion of the trial judge, who enjoys the best position to view the demeanor of counsel and the atmosphere of the trial. [Citation.] Accordingly, determinations regarding closing arguments will not be reversed absent an abuse of discretion.” 
Rockwood
, 258 Ill. App. 3d at 558. Given that the trial court reminded the jury that closing arguments are not evidence, we cannot say that the court’s determination here was an abuse of discretion.

The other instance cited by plaintiffs that took place before the jury was the following stipulation:

“MR. KARASIK [defendant’s counsel]: Yes your honor. I believe counsel is willing to stipulate that Mr. King did learn that his wife was advised to contact an attorney sometime on the night of January 24, 1994. So stipulated?

MR. BRENT [plaintiffs’ counsel]: So stipulated.”

Given that this instance consisted of a stipulation by the parties, we fail to see how plaintiffs could have been unfairly prejudiced by it. 
Cf. People v. Bowman
, 221 Ill. App. 3d 663, 666 (1991) (“[D]efendant cannot participate in an agreement and stipulation which accrues to his benefit, and then complain on review about the inevitable result of the agreement. He invited or agreed to the procedure and is now estopped from asserting it as error”).

The remaining instances of “evidence” cited by plaintiffs all took place out of the presence of the jury. We do not see how any of these instances could have affected the outcome here as it pertains to the jury’s special finding. Accordingly, we conclude that plaintiffs were not unfairly prejudiced.

Plaintiffs also challenge the trial court’s refusal to strike any evidence suggesting that Jennifer was contributorily negligent. Plaintiffs contend that there were many “subtle intimations” that if Jennifer had only done the right thing, LaTonya would have survived. They point, for example, to defense counsel’s comment in his closing argument about the “walking to the hospital issue.” According to plaintiffs, any suggestion that Jennifer walked rather than rode to the hospital “was used to suggest that Jennifer, and not Dr. Garces, should be to blame.”

Near the end of the trial, after both sides had rested, plaintiffs asked the court to go back and strike any evidence that suggested or implied that Jennifer was negligent. Plaintiffs did not identify specific examples of evidence that they wanted stricken. The trial court denied the request, noting that there had been no claim of contributory negligence. Therefore, any evidence suggesting that someone other than defendant was at fault would simply go to the issue of whether Dr. Garces was negligent, which was the central issue in the trial. The court also stated that it would be an “insurmountable task” to go back to the beginning of the trial and “go witness by witness,” determining which testimony should be stricken, and then telling the jury to strike that evidence. The court would have to restate the testimony for the jurors in order to refresh their memories, and then would be in the somewhat awkward position of telling the jury to strike that same testimony.

We agree with the trial court and with the appellate court, which expressly upheld this ruling. A defendant is always free to offer evidence that the conduct of a third person was the sole proximate cause of the plaintiff’s injuries. 
McDonnell
, 192 Ill. 2d at 520-21. We also note plaintiffs’ failure to identify for the trial court the specific examples of evidence that it wanted stricken. It was unreasonable for plaintiffs to expect the trial court to scour the record in search of error. See 
People v. Biloche
, 414 Ill. 504, 511 (1953).

Finally, plaintiffs argue that they were unfairly prejudiced when the trial court refused to give a missing-evidence instruction. Such an instruction would advise the jury that, if a party fails to offer evidence that is within its power to produce, the jury may infer that this evidence would be adverse to that party. See Illinois Pattern Jury Instructions, Civil, No. 5.01 (3d ed. 1995) (hereinafter IPI Civil 3d No. 5.01). The evidence at issue here was LaTonya’s measurements, particularly her weight, which, according to testimony at trial, were recorded when Jennifer and LaTonya went to Dr. Garces’ clinic in the afternoon on January 24. Plaintiffs argued to the trial court that because this record was never produced, they were entitled to have an IPI Civil 3d No. 5.01 missing-evidence instruction given.

The trial court refused to give the instruction, stating that it would be inappropriate because defendant offered a “plausible reason” for its failure to produce the record. We agree with the trial court and with the appellate court, which upheld this determination. The decision whether to give an IPI Civil 3d No. 5.01 missing-evidence instruction is within the sound discretion of the trial court. 
Schaffner v. Chicago & North Western Transportation Co.
, 129 Ill. 2d 1, 22 (1989). This instruction is warranted only if “there was no reasonable excuse for failure to produce the evidence.” 
Brown v. Moawad
, 211 Ill. App. 3d 516, 531 (1991). Here, defendant provided a reasonable explanation. The permanent chart that was generated for LaTonya on January 21, 1994, when she made her first visit to the clinic, was out of the office for billing and was not available on January 24. For that reason, LaTonya’s measurements that were taken at the clinic on January 24 were recorded on a temporary chart. The information from the temporary chart was never entered into the permanent chart because Dr. Garces did not see LaTonya on that day.

It was not an abuse of discretion for the trial court to refuse to give an IPI Civil 3d No. 5.01 instruction here. Plaintiffs were not unfairly prejudiced, particularly in light of the fact that the court, while refusing the instruction, nevertheless allowed plaintiffs to argue whatever inferences they felt the jury should draw from defendant’s failure to produce the record. Accordingly, in his closing argument, plaintiffs’ counsel told the jury that:

 “We also heard that Jennifer went to the clinic and was never seen by the doctor. There’s a dispute about what happened then. Was she weighed? Was LaTonya King weighed? Well, was the temperature taken? Was the head circumference taken? Did we see that chart? Did we see those measurements? Did we get that weight when we were doing all the math? *** Did we get the one weight that really mattered in this case?”

Plaintiffs thus were able to argue the missing-evidence issue to the jury.

CONCLUSION

We hold, as did the appellate court, that the jury’s special finding was absolutely irreconcilable with the general verdict, and the trial court therefore properly entered judgment in favor of defendant. The special interrogatory was in proper form and was not confusing, and the jury’s response to it was not against the manifest weight of the evidence. Plaintiffs received a fair trial. They were not unfairly prejudiced by the alleged errors and instances of alleged misconduct that they put forth. For the foregoing reasons, we affirm the judgment of the appellate court.

Affirmed.

FOOTNOTES
1:     
1
LaTonya was survived by her parents and three siblings, including her twin sister, LaToya. 

2:     
2
According to Dr. An’s testimony and that of other medical professionals in this case, when well-hydrated skin is pinched, it returns quickly to its original state, and thus has good skin turgor, or tension. Skin that is dehydrated, however, returns more slowly to its original state. 

3:     
3
This definition of “dehydration” was echoed by every physician who testified at trial. Dr. An, the medical examiner, termed it “loss of water from the body”; Dr. Michael Kaufman, one of two defense experts, defined it as “essentially a relative loss of body fluids”; and Dr. William Wittert, the other defense expert, explained that it is “a clinical state where the body or a patient or a person loses excess body water.” 

4:    
4
In his opening statement, plaintiffs’ counsel asserted that “drowsiness, diarrhea, and unwillingness to suck [are] classic signs of dehydration for a 26-day-old baby.”