# Illinois Official Reports

## Supreme Court

---

**_Stanphill v. Ortberg_, 2018 IL 122974**

---

| | |
|---|---|
| Caption in Supreme Court: | ZACHARY STANPHILL, as Administrator of the Estate of Keith Sylvester Stanphill, Deceased, Appellee, v. LORI ORTBERG *et al.*, Appellants. |
| Docket No. | 122974 |
| Filed<br>Rehearing denied | December 28, 2018<br>March 18, 2019 |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on appeal from the Circuit Court of Winnebago County, the Hon. J. Edward Prochaska, Judge, presiding. |
| Judgment | Appellate court judgment affirmed.<br>Circuit court judgment reversed.<br>Cause remanded. |
| Counsel on Appeal | Hugh C. Griffin and Stevie A. Starnes, of Hall Prangle & Schoonveld, LLC, and Laura G. Postilion, of Quintairos, Prieto, Wood & Boyer, P.A., both of Chicago, for appellants.<br><br>Lori A. Vanderlaan and James F. Best, of Best, Vanderlaan & Harrington, of Chicago, for appellee. |

Michael Resis, of SmithAmundsen LLC, of Chicago, for *amicus curiae* Illinois Association of Defense Trial Counsel.

David R. Nordwall, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

Justices        JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Thomas, Kilbride, Theis, and Neville concurred in the judgment and opinion.

Justice Garman dissented, with opinion.

## OPINION

¶ 1      In this case, we are asked to determine whether the special interrogatory that was given to the jury at trial was in proper form and whether the jury's answer to the special interrogatory was inconsistent with its general verdict in the plaintiff's favor. The circuit court of Winnebago County held that the jury's answer to the special interrogatory was inconsistent with the general verdict and entered judgment in favor of the defendants. The appellate court reversed. 2017 IL App (2d) 161086. The appellate court found that the special interrogatory was not in proper form and, therefore, should not have been given to the jury. In addition, the court determined that, because the special interrogatory was ambiguous, the jury's answer was not necessarily inconsistent with its general verdict. For the reasons that follow, we affirm the judgment of the appellate court.

¶ 2                                BACKGROUND

¶ 3      Plaintiff Zachary Stanphill, as administrator of the estate of his deceased father, Keith Stanphill (Keith), filed a wrongful death and survival action against Lori Ortberg (Ortberg), a licensed clinical social worker and employee assistance program counselor, and her employer Rockford Memorial Hospital (Rockford). [1] Plaintiff alleged in the complaint that, on September 30, 2005, Keith had an initial, one-hour appointment with Ortberg and that it was Ortberg's duty at that time to evaluate and assess Keith's mental health condition. It was further alleged that Ortberg breached her duty by performing an inadequate assessment of Keith's mental status and, as a result, Ortberg incorrectly diagnosed Keith's condition, failed to recognize that he was at high risk for suicide, and failed to refer him to a hospital emergency room or a psychiatrist for immediate evaluation and treatment. Finally, it was alleged that, as

---

[1] This suit was originally filed in June 2007 by Susan Stanphill, Keith's wife, serving as administrator of the estate. Susan later relinquished any and all rights she might have as a beneficiary under the Wrongful Death Act (740 ILCS 180/1 *et seq.* (West 2012)) and to any claims and/or proceeds resulting from settlement or judgment in this case. When Zachary Stanphill, Keith's son, turned 18, he was substituted as administrator of the estate, and the cause of action was refiled in February 2014.

a consequence of Ortberg's professional negligence, Keith did not receive the care and assistance he required, which led to his death by suicide on or about October 6, 2005.

¶ 4    A jury trial took place between May 24 and June 2, 2016. At trial, Keith's wife, Susan, testified that she and Keith married in 1987 and had two children: Zachary, born December 1995, and Kayla, born August 2002. According to Susan, Keith's mental health had never been an issue until April 2005, when she told Keith about a relationship she was having with another man, Michael Barnhart, who was a security guard at the school where Susan worked. After learning about this relationship, Keith's mental condition noticeably began to decline. Susan testified that, despite her attempts to assure Keith that she was committed to their marriage, Keith worried that she would leave him. Keith's concerns increased in mid-August 2005, when he became aware that Barnhart was calling Susan at home. Then, in late August 2005, Keith received a letter from Barnhart's wife, which contained copies of romantic e-mails Susan and Barnhart had exchanged. After receiving those e-mails, Keith spiraled into a deep depression.

¶ 5    Susan testified that, after Keith received the e-mails, she and Keith sought counseling from her father, Wesley Poe, who was also the minister at the Pentecostal Church of Jesus Christ, where they attended services. In addition, Susan made an appointment for Keith to see his physician. The physician prescribed an antidepressant for Keith that he began taking on September 8, 2005. However, despite the counseling with Susan's father and the medication, Keith's mental condition did not improve. Keith began losing weight and wasn't sleeping. Susan testified that Keith "moped around," dragging his feet with his head hung low. Although he continued to go to his job as a car salesman—work he had successfully done for more than 20 years—his sales began to decrease. Keith also lost interest in recreational activities he used to enjoy. Keith continued to attend church services, but he stopped actively participating or helping out as he had done in the past.

¶ 6    Susan testified that, about two weeks before Keith committed suicide, there were a few occasions when she woke up at night to find Keith sitting on the side of the bed, watching her sleep. Because of this, Susan asked Keith to sleep at her father's house, and Keith agreed. Susan explained that, although Keith slept at the Poe residence, he would come home early in the morning to get dressed for work and to make breakfast for the children. After work, he would come home and spend the evening with the family. Then around 10 p.m., he would go to the Poe residence to sleep.

¶ 7    Keith also agreed to see a counselor, which Susan arranged through her employee assistance program (EAP).[2] Susan testified that she told the scheduler at the EAP that her husband "was really depressed because he thought I was having an affair." Keith was given an appointment with Lori Ortberg on September 30, 2005. Susan further testified that she did not go to the appointment with Keith but knew that he kept it because she saw the paperwork that he had been given following the appointment. From this paperwork, Susan learned that Keith was referred to another counselor for additional counseling sessions. With Susan's

---

[2]It was explained at trial that the EAP was a benefit available to Susan and her family through Susan's employer-provided insurance. The EAP acts as a "gatekeeper" for coverage of mental health services. In most instances, the EAP counselor would not provide the actual counseling but simply evaluate the client and determine what additional services were necessary. The EAP counselor would then make an appropriate referral and authorize, for insurance purposes, a certain number of sessions.

encouragement and prodding, Keith called the other counselor's office on Tuesday, October 4, 2005, and was given an appointment for October 11, 2005.

¶ 8     On Thursday, October 6, 2005, Susan left with the children to visit her sister in Kentucky. The trip was preplanned and one she and the children made annually, taking advantage of the school vacation for the Columbus Day holiday. Susan testified that Keith did not appear upset about her leaving and she had not been concerned about leaving Keith alone because, although he was depressed, he had never before attempted suicide and never expressed any thoughts about suicide to her or, as far as she knew, to anyone else. Therefore, she never suspected that he would commit suicide.

¶ 9     Later in the evening of October 6, 2005, after Susan and the children left on their trip, Keith went to the Poe residence and ate dinner with his in-laws. He asked for the leftovers to have for his lunch at work the next day. He watched some TV with the Poes, then went home. The next day, however, Keith did not show up for work. He also did not answer any of Susan's phone calls. On Sunday, October 9, 2005, Susan called her father since she was still unable to reach Keith. When her father told her that Keith had not gone to church services that day, she asked him to go to the house to check on Keith. Wesley Poe and his wife Glenda then drove to the Stanphill home. There they found Keith on the floor of the garage. Subsequent autopsy results showed that he had died of asphyxiation due to carbon monoxide poisoning. Near Keith's body was a note, which was attached to copies of the e-mails that were sent to him by Barnhart's wife. The note read, "The day my heart broke forever. When I read these emails."

¶ 10     Lori Ortberg also testified at the trial. She explained that she met Keith Stanphill for the first and only time on September 30, 2005, when he came to see her for a one-hour appointment. It was her testimony, however, that at the time of trial she had no independent recollection of Keith or the appointment. Her testimony regarding Keith's single counseling session, therefore, was based on the records kept in his file, the notes written on his chart during and following his appointment, and on her custom and practice in providing counseling services through the EAP for more than a decade.

¶ 11     Ortberg testified that when Keith arrived at her office for his appointment he was given a self-assessment questionnaire to fill out. Keith checked off boxes on the form, which indicated the following: he had feelings of harming himself or others "most of the time"; feelings of sadness "most of the time"; sleep changes "most of the time"; appetite changes "all of the time"; feelings of anxiety, nervousness, worry, and fear "all of the time"; sudden unexpected panic attacks "most of the time"; and feelings of being on the verge of losing control "most of the time." Ortberg testified that during the session she reviewed Keith's responses with him. According to her notes, Keith told her that he had lost weight and that he had seen his physician and was prescribed an antidepressant. However, because the notes were not detailed, Ortberg could not say if she was told how much weight Keith lost, the name of his doctor, or the specific medication prescribed, nor did she know if he was taking the medicine or whether it was helping him.

¶ 12     Ortberg testified that she definitely discussed Keith's response regarding "harming himself or others" because her notes reflected that Keith denied having a suicide plan or any suicidal or homicidal ideation. Thus, despite his responses on the form, after speaking with Keith, Ortberg believed that he was not at imminent risk of harming himself. Ortberg diagnosed Keith as having "adjustment disorder with depressed mood" and authorized further counseling

sessions with another licensed clinical social worker who specialized in dealing with people who were having marital difficulties, since this was the reason for Keith's current depressed mood.

¶ 13    Ortberg conceded on cross-examination that, as a competent licensed clinical social worker, if she believed a client was at imminent risk of committing suicide, it would be her duty to see that the client was taken to a hospital emergency room—either by a family member or by the police—for further evaluation and, if a psychiatrist found it to be necessary, admission for inpatient treatment. In this case, however, Ortberg testified that she had concluded that Keith was not at imminent risk of committing suicide. Therefore, she did not contact Keith's family or refer him to an emergency room or psychiatrist for further evaluation or observation.

¶ 14    The jury also heard testimony from four expert witnesses, two for the plaintiff and two for the defense. One of the plaintiff's experts was Daniel Potter, a licensed clinical social worker, who testified regarding the standard of care applicable to all licensed clinical social workers. According to Potter, a competent licensed clinical social worker must conduct a thorough evaluation, reflected by detailed notes on the client's chart. Also, the applicable standard of care required a licensed clinical social worker to recognize the signs that a client is at imminent risk of committing suicide and, if so, see that the client is evaluated by a hospital emergency room or psychiatrist. Potter then opined that on September 30, 2005, Ortberg breached the standard of care and was professionally negligent in that she failed to conduct a proper evaluation of Keith's mental health status and, as a result, failed to recognize that Keith was suicidal at that time and failed to take the necessary steps to have Keith taken to an emergency room or to be seen by a psychiatrist for further evaluation and possible inpatient treatment.

¶ 15    Counter to Potter's testimony, defense witness Terry Lee, also a licensed clinical social worker, testified that Ortberg complied with the applicable standard of care by conducting a thorough evaluation of Keith. In Lee's view, Keith was not suicidal on September 30, 2005, when he met with Ortberg. This, Lee said, was evidenced by the fact that Keith made a follow-up appointment with the counselor recommended by Ortberg. According to Lee, a person who is suicidal and without hope doesn't make an appointment to see a counselor on some future date.

¶ 16    The plaintiff's second expert witness was Dr. Bawden, a psychiatrist. He testified that, based on the deposition testimony and records he reviewed, he believed that Keith was at imminent risk of committing suicide on September 30, 2005, when he was seen by Ortberg. Dr. Bawden also testified that he agreed with Potter that Ortberg failed to conduct a proper evaluation and assessment of Keith and incorrectly diagnosed him with adjustment disorder, failing to recognize the level of Keith's depression. In Dr. Bawden's opinion, Ortberg's failures were a proximate cause of Keith's death because, if Ortberg had recognized that Keith was depressed and suicidal, she would have referred Keith to an emergency room or a psychiatrist on September 30, 2005, and his suicide would have been prevented.

¶ 17    On cross-examination, Dr. Bawden was asked, "[Do you] think it was reasonably foreseeable to Ms. Ortberg that Mr. Stanphill would commit suicide about a week later?" He responded, "No, it wasn't that it was that way to her, but it should have been that way to her, based on the information she had. It wasn't that she thought that he was suicidal and she ignored that. She didn't believe he was. From her frame of reference." Dr. Bawden further

clarified, stating, "she should have foreseen that he was at a high enough risk to require referral to an appropriately qualified person, provider."

¶ 18 The psychiatric expert witness for the defense was Dr. Hanus. It was Dr. Hanus's testimony, based on his review of the deposition testimony and record evidence, that Keith was not suicidal or at imminent risk of harming himself on September 30, 2005, and, therefore, Ortberg could not have reasonably foreseen that Keith would commit suicide on or before October 9, 2005. Moreover, Dr. Hanus testified that the fact that Ortberg did not refer Keith to an emergency room or psychiatrist on September 30, 2005, was not the proximate cause of his death. According to Dr. Hanus, even if Ortberg had believed Keith was at risk and had referred Keith to an emergency room or psychiatrist on September 30, 2005, his subsequent suicide would not have been prevented. This is because, according to Dr. Hanus, a psychiatrist or emergency room evaluator would not have foreseen that Keith would commit suicide for the same reason it wasn't foreseeable to Ortberg—because Keith was not suicidal or at imminent risk of committing suicide on that date.

¶ 19 After hearing all of the evidence, the jury was instructed by the court. The jury was told that the issue before them was whether Ortberg was "professionally negligent" because she (1) failed to recognize that Keith Stanphill was suicidal, (2) failed to properly diagnose Keith Stanphill's depression, (3) failed to evaluate Keith Stanphill with the proper mental health assessment, (4) failed to refer Keith Stanphill to a psychiatrist, or (5) failed to refer Keith Stanphill to a hospital emergency room. The court defined "professional negligence," in accord with Illinois Pattern Jury Instructions, Civil, No. 105.01 (2011), as follows:

> "A licensed clinical social worker must possess and use the knowledge, skill, and care ordinarily used by a reasonably careful licensed clinical social worker. The failure to do something that a reasonably careful licensed clinical social worker would do, or the doing of something that a reasonably careful licensed clinical social worker would not do, under circumstances similar to those shown by evidence, is 'professional negligence.'
>
> The phrase 'deviation from the standard of care' means the same thing as 'professional negligence.'
>
> The law does not say how a reasonably careful licensed clinical social worker would act under these circumstances. That is for you to decide. In reaching your decision, you must rely upon opinion testimony from qualified witnesses or evidence of policies. You must not attempt to determine how a reasonably careful licensed clinical social worker would act from any personal knowledge you may have."

¶ 20 Defendants proffered a special interrogatory, and the circuit court submitted it to the jury over plaintiff's objection, relying on the decision in *Garcia v. Seneca Nursing Home*, 2011 IL App (1st) 103085. The special interrogatory, which tracked the language of the special interrogatory in *Garcia*, asked the jury to respond "Yes" or "No" to the following question:

> "Was it reasonably foreseeable to Lori Ortberg on September 30, 2005, that Keith Stanphill would commit suicide on or before October 9, 2005?"

¶ 21 During closing argument, plaintiff's counsel reminded the jury that it would be required to answer a special interrogatory that asked whether Keith's suicide was reasonably foreseeable to Lori Ortberg on September 30, 2005. Plaintiff's counsel told the jury: "The answer is absolutely yes, without question. Absolutely yes, without question." The defense, on the other

hand, advised the jury, "This is our special interrogatory *** and I would ask that you check the box no."

¶ 22    After deliberating, the jury entered a general verdict, finding in favor of the plaintiff and against the defendants. Damages were awarded on the wrongful death claim in the amount of $1,495,151.[3] However, the jury answered "No" on the special interrogatory.

¶ 23    After hearing argument from the parties, the circuit court concluded that it was bound by the appellate court decision in *Garcia* and ruled that the answer to the special interrogatory was inconsistent with the general verdict in plaintiff's favor. Consequently, the circuit court overturned the general verdict and entered judgment in defendants' favor. Plaintiffs filed a posttrial motion, challenging that decision. However, the circuit court, while expressing serious misgivings about the correctness of *Garcia*, denied plaintiff's posttrial motion.

¶ 24    Plaintiff appealed. On review, the appellate court held that the jury's answer to the special interrogatory was not absolutely irreconcilable or necessarily inconsistent with the general verdict in plaintiff's favor. 2017 IL App (2d) 161086, ¶ 29. However, the appellate court also held that, even if an inconsistency existed, the special interrogatory was not in proper form because it asked whether Keith's suicide was reasonably foreseeable to *Lori Ortberg*, rather than asking whether it was foreseeable to a reasonable person or reasonable licensed clinical social worker. *Id.* ¶ 33. In this way, the court said, the special interrogatory distorted the law and made the question ambiguous and misleading to the jury. *Id.* For these reasons, the appellate court held that the special interrogatory should not have been given to the jury and reversed the circuit court's judgment. *Id.* ¶¶ 33, 47. The cause was remanded with instructions that judgment be entered for the plaintiff on the general verdict. *Id.* ¶¶ 47-48.

¶ 25    We granted defendants' petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Nov. 1, 2017). In addition, we allowed *amicus curiae* briefs to be filed by the Illinois Association of Defense Trial, on behalf of defendants, and by the Illinois Trial Lawyers Association, on behalf of plaintiff.

¶ 26                                              ANALYSIS

¶ 27    In this appeal, defendants contend that the appellate court erred when it found that the special interrogatory was not in proper form and that the jury's answer to the special interrogatory was not necessarily inconsistent or absolutely irreconcilable with the general verdict in plaintiff's favor. Defendants ask that we reverse the appellate court and affirm the circuit court's judgment entered on the special interrogatory.

¶ 28    Before reaching these issues, we address defendants' threshold claim that plaintiff did not preserve his "appeal objection to the wording of the special interrogatory." Defendants contend that, at trial, plaintiff failed to make a specific objection to the special interrogatory on the ground that it asked about foreseeability as to Lori Ortberg and not to a reasonable person or reasonable licensed clinical social worker. As a result, defendants contend that plaintiff forfeited this claim on appeal and the appellate court should not have considered it. We find no merit to this claim.

¶ 29    Defendants raised this same forfeiture argument in the appellate court. After reviewing the record, the court found that plaintiff's objections at trial to the special interrogatory sufficiently

_____

[3]No damages were awarded on the survival claim.

raised an objection to the inclusion of Ortberg in its wording. 2017 IL App (2d) 161086, ¶ 23. Our own review of the transcripts of the jury instruction conference convinces us that the appellate court was correct. The record shows that plaintiff's counsel argued that the jury could answer the special interrogatory "no," finding that Keith's suicide was not reasonably foreseeable to Ortberg, because the jury believed that Ortberg was negligent "[b]ecause she didn't do the job. She didn't meet the standard of care." In this way, counsel argued that, because the special interrogatory asked about foreseeability as to Ortberg, the special interrogatory was confusing and "not a real test of the verdict." Defense counsel understood that these objections centered on the inclusion of Ortberg in the interrogatory because defense counsel's response was that including Ortberg in the special interrogatory was necessary according to *Garcia*. Accordingly, we see no basis for finding forfeiture and now proceed to the issues before us in this appeal.

¶ 30 Special interrogatories are governed by section 2-1108 of the Code of Civil Procedure (735 ILCS 5/2-1108 (West 2016)), which provides:

"§ 2-1108. Verdict—Special interrogatories. Unless the nature of the case requires otherwise, the jury shall render a general verdict. The jury may be required by the court, and must be required on request of any party, to find specially upon any material question or questions of fact submitted to the jury in writing. Special interrogatories shall be tendered, objected to, ruled upon and submitted to the jury as in the case of instructions. Submitting or refusing to submit a question of fact to the jury may be reviewed on appeal, as a ruling on a question of law. When the special finding of fact is inconsistent with the general verdict, the former controls the latter and the court may enter judgment accordingly."

¶ 31 Pursuant to this statute, the questions before us—whether the special interrogatory proffered by defendants was in proper form and whether the special interrogatory was inconsistent with the general verdict—are questions of law and are therefore reviewed *de novo*. See, *e.g.*, *People v. Clemons*, 2012 IL 107821, ¶ 8.

¶ 32 We first address whether the special interrogatory was in proper form. In this case, the appellate court held that the interrogatory was not in proper form because it did not apply the objective "reasonable person" standard for determining foreseeability and, as a result, it misstated the law, was ambiguous and confusing, and should not have been given to the jury. 2017 IL App (2d) 161086, ¶ 33. We agree.

¶ 33 A special interrogatory is proper and must be given upon a party's request if it tests an ultimate fact on which the rights of the parties depend. *Hooper v. County of Cook*, 366 Ill. App. 3d 1, 6 (2006). Here, plaintiff brought suit against defendants under the Wrongful Death Act (740 ILCS 180/1 *et seq.* (West 2012)) to recover for losses suffered as a result of Keith's death. In this wrongful death action, as in any negligence action, it was plaintiff's burden to prove three essential elements: (1) that defendants owed a duty, (2) that defendants breached the duty they owed, and (3) that the breach proximately caused the injury. See *Williams v. Manchester*, 228 Ill. 2d 404, 415 (2008) (the elements of a wrongful death claim are identical to those of a common-law negligence claim); *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 525 (1987).

¶ 34 The proximate cause element is a factual question for the jury to decide and has two components: cause in fact and legal cause. *Turcios v. The DeBruler Co.*, 2015 IL 117962, ¶ 23;

*Hooper*, 366 Ill. App. 3d at 7. "Cause in fact" is established where there is reasonable certainty that the injury would not have occurred "but for" the defendant's conduct or where a defendant's conduct was a "substantial factor" in bringing about the harm. *Turcios*, 2015 IL 117962, ¶ 23. Legal cause, however, is essentially a question of policy, *i.e.*, "How far should a defendant's legal responsibility extend for conduct that did, in fact, cause the harm?" (Internal quotation marks omitted.) *Id.* ¶ 24. Legal cause, therefore, is established only when it can be said that the injury was reasonably foreseeable. *Id.*; *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 456 (1992). Importantly, we have always held that whether an injury is "reasonably foreseeable" is an objective test, not a subjective one. That is, the question is not what the individual defendant herself thought would be the likely result of the alleged negligent conduct. Rather, the question is what a *reasonable person* would see the likely result to be. *Turcios*, 2015 IL 117962, ¶ 24; *Lee*, 152 Ill. 2d at 456; *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 395 (2004).

¶ 35    In wrongful death cases involving suicide, the general rule is that the injured party's voluntary act of suicide is an independent intervening act, which is unforeseeable as a matter of law and breaks the causal link between any alleged negligent conduct and the injury. *Turcios*, 2015 IL 117962, ¶ 20. Nevertheless, our courts have held that, where a plaintiff can show that the suicide was a reasonably foreseeable result of the defendant's conduct, liability will attach. *Id.*; *Hooper*, 366 Ill. App. 3d at 8; *Winger v. Franciscan Medical Center*, 299 Ill. App. 3d 364, 375 (1998). Accordingly, whether it is reasonably foreseeable that person is at risk of suicide is a key factor in determining whether the proximate cause element has been sufficiently proven. As such, whether Keith's suicide was reasonably foreseeable in this case is an ultimate fact upon which the rights of the parties depend and, therefore, a proper subject for a special interrogatory. *Hooper*, 366 Ill. App. 3d at 8.

¶ 36    In this case, defendants proffered a special interrogatory that was intended to test the foreseeability aspect of the proximate cause element. However, the interrogatory did not apply an objective standard and ask whether it was foreseeable to a reasonable person or to a reasonable licensed clinical social worker that Keith Stanphill was at risk of committing suicide. Instead, the interrogatory was phrased in the subjective, asking whether it was "reasonably foreseeable to Lori Ortberg on September 30, 2005, that Keith Stanphill would commit suicide on or before October 9, 2005." Because the interrogatory was phrased in the subjective, it was necessarily improper. Indeed, no other conclusion is possible. A negligent defendant, by definition, does not foresee the likely result of her tortious conduct. Thus, if legal cause were defined in the subjective, *i.e.*, if it were defined as what the individual defendant foresaw the likely result of her conduct to be, then legal cause would never exist in those instances where defendant's conduct is negligent. This cannot be the case. Accordingly, because the interrogatory in this case did not apply an objective standard to determine reasonable foreseeability, it did not test an ultimate fact of the case and should not have been given to the jury.

¶ 37    Defendants contend, however, that the interrogatory was in proper form because this is a professional negligence case and, therefore, the "reasonable person" standard does not apply. We disagree. If the reasonable person standard was inappropriate in this case because professional negligence was at issue, then the solution was to employ an objective, professional standard in the interrogatory, *i.e.*, to ask the jury whether it was foreseeable to a reasonable licensed clinical social worker that Keith Stanphill was at risk of committing suicide. The fact

that this case involves professional negligence does not justify employing a subjective standard of foreseeability.[4]

¶ 38    Defendants further contend that, based on the decision in *Garcia*, 2011 IL App (2d) 103085, the interrogatory given in this case was appropriate. Again, we disagree. In *Garcia*, plaintiff brought a cause of action against Seneca Nursing Home for the wrongful death of a patient, Roberto Garcia. Garcia was blind and suffered from a number of ailments, including paranoid schizophrenia. *Id.* ¶ 4. He was placed on the fifth floor of the nursing home, which was a secured floor for mentally ill patients. *Id.* ¶ 5. Among the various security measures on this floor was the fact that the windows did not open more than eight inches and were covered by screens. *Id.* However, one day, a nurse noticed that the window in Garcia's room was opened and discovered Garcia on the ground five stories below. *Id.* ¶ 9. He had died from the fall. *Id.*

¶ 39    Over plaintiff's objection, the trial court submitted to the jury a special interrogatory, which was phrased in the subjective and asked, " 'Prior to Roberto Garcia's death, was it reasonably foreseeable to [defendant] that he would commit suicide or act in a self-destructive manner on or before April 21, 2004?' " *Id.* ¶ 10. Plaintiff challenged the interrogatory but argued only that it was too narrow because it did not address the foreseeability that Garcia, unaware of the risk due to blindness or delusion, would accidentally or unintentionally fall out of the window. *Id.* ¶ 37. The jury returned a general verdict for plaintiff but answered the interrogatory in the negative. *Id.* ¶ 11. The circuit court entered judgment on the special interrogatory, finding it to be irreconcilable with the general verdict, and the appellate court affirmed. *Id.* ¶ 13.

¶ 40    Defendants' reliance on *Garcia* is misplaced. Although it is true that the interrogatory in *Garcia* was phrased in the subjective and asked whether Garcia's death was reasonably foreseeable to the defendant, plaintiffs never objected to the interrogatory on this ground, and neither the trial court nor the appellate court considered whether the interrogatory was improper because of this wording. Including the defendant in the foreseeability calculus was never at issue. Therefore, *Garcia* does not provide support for defendants' claim that a subjective standard was appropriate here.

¶ 41    We note, too, that in finding an inconsistency between the verdicts, the *Garcia* court relied heavily on *Hooper*, noting that "[d]efendant drew the wording of the interrogatory verbatim from the case of *Hooper v. County of Cook*" (*id.* ¶ 10) and later stating that, "[i]n this case, defendant tendered an interrogatory that was identical to the one in *Hooper*" (*id.* ¶ 41). However, the proffered interrogatory in *Hooper* actually employed an objective standard for

---

[4]The dissent concludes that the special interrogatory was in proper form because it did, in fact, set forth an objective standard of foreseeability. Emphasizing the word "reasonably," the dissent determines that "when the interrogatory asked whether the suicide was *reasonably* foreseeable to Ortberg, it asked whether it was foreseeable to her as a reasonably careful licensed clinical social worker. When asking whether the results of a defendant's actions were reasonably foreseeable to the defendant, the court asks, objectively, whether they were foreseeable to a reasonable person in the defendant's shoes." *Infra* ¶ 57. The dissent has rewritten the special interrogatory. The interrogatory did not ask whether the suicide was foreseeable to a reasonably careful licensed clinical social worker. Instead, it explicitly asked whether Lori Ortberg thought the suicide was reasonably foreseeable. That is a subjective standard of foreseeability and is improper. The inclusion of the word "reasonably" before Ortberg's name does not change this fact.

finding foreseeability. *Hooper*, 366 Ill. App. 3d at 3 (" 'Prior to the death of [Louise] Hooper, was it reasonably foreseeable that she would commit suicide or act in a self-destructive manner on or before December 6, 1997?' "). Therefore, to the extent that the *Garcia* opinion can be read as holding that an interrogatory is properly worded if it contains a subjective standard for determining foreseeability, it is overruled.

¶ 42 Because we have found that the special interrogatory proffered by defendants was not in proper form and should not have been given to the jury, we need not consider whether the jury's answer to the special interrogatory was inconsistent with the general verdict.

¶ 43                                        CONCLUSION

¶ 44 We hold that the special interrogatory proffered by defendants was not in proper form and should not have been given to the jury. Accordingly, we affirm the appellate court's judgment, which reversed the circuit court's judgment entered on the special interrogatory and remanded with instructions that judgment be entered on the general verdict in plaintiff's favor.

¶ 45 Appellate court judgment affirmed.

¶ 46 Circuit court judgment reversed.

¶ 47 Cause remanded.

¶ 48 JUSTICE GARMAN, dissenting:

¶ 49 At issue is whether a special interrogatory given to the jury was in proper form and whether the jury's answer to that interrogatory was inconsistent with its general verdict. Essentially, the answer to the first question hinges on whether the interrogatory was objective. I would find that it was.

¶ 50 Zachary Stanphill, on behalf of his father's estate, alleged that Lori Ortberg, a licensed clinical social worker, failed to properly assess the decedent's mental health and foresee his suicide. After the trial, the jury was instructed that it was to determine if Ortberg was professionally negligent and was given the Illinois Pattern Jury Instruction for professional negligence by a licensed clinical social worker. That instruction, as given, states that "[a] licensed clinical social worker must possess and use the knowledge, skill, and care ordinarily used by a reasonably careful licensed clinical social worker." See Illinois Pattern Jury Instruction, Civil, No. 105.01 (2011). The jury was thus instructed that the standard against which they were to judge Ortberg's conduct was that of a "reasonably careful licensed clinical social worker." Along with that and other instructions, the jury was given the special interrogatory, asking if it was "reasonably foreseeable to Lori Ortberg on September 30, 2005, that Keith Stanphill would commit suicide on or before October 9, 2005?" Despite returning a general verdict for the estate, the jury answered that interrogatory in the negative. The majority finds that the interrogatory was not in proper form because it was not objective. I respectfully disagree.

¶ 51 "A special interrogatory is to be read in context with the court's other instructions to determine how it was understood and whether the jury was confused." *Simmons v. Garces*, 198 Ill. 2d 541, 563 (2002). In this case, the jury was instructed that Ortberg was held to a "reasonably careful licensed clinical social worker" standard. Thus when the interrogatory asked whether the suicide was *reasonably* foreseeable to Ortberg, it asked whether it was

- 11 -

foreseeable to her as a reasonably careful licensed clinical social worker. When asking whether the results of a defendant's actions were reasonably foreseeable to the defendant, the court asks, objectively, whether they were foreseeable to a reasonable person in the defendant's shoes. In other words, the court asks whether the defendant foresaw or should have foreseen the results. The majority, however, proceeds as if the special interrogatory lacks the modifier "reasonably" before "foreseeable."

¶ 52    The special interrogatory was not ambiguous or confusing. To ask whether the suicide was simply "foreseeable" to Ortberg would indeed be ambiguous; the majority would then be correct that a reasonable hypothesis existed that the jury may have determined that her negligence caused her to fail to foresee it. To ask whether it was "reasonably foreseeable," however, places Ortberg in the shoes of a reasonably careful licensed clinical social worker, on which standard the jury was instructed. Adding the word "reasonably" before "foreseeable" changes the question from asking whether she actually foresaw Stanphill's suicide to asking whether she should have foreseen it under the applicable standard. The majority correctly points out that the negligent defendant does not foresee the results of her tortious conduct. What it fails to mention is that the negligent defendant is likewise not reasonable.

¶ 53    In requesting the special interrogatory, defendants relied almost verbatim on the special interrogatory from *Garcia v. Seneca Nursing Home, Inc.*, 2011 IL App (1st) 103085. The majority holds that the *Garcia* interrogatory is also subjective. The majority then states that the interrogatory from the case on which *Garcia* relied, *Hooper v. County of Cook*, 366 Ill. App. 3d 1, 3 (2006), was objective. The interrogatory at issue in *Garcia* was taken verbatim from *Hooper* except that it added "to [defendant]." Compare *Hooper*, 366 Ill. App. 3d at 3, with *Garcia*, 2011 IL App (1st) 103085, ¶ 10.

¶ 54    Phrasing special interrogatories as in *Hooper*, now approved by this court as objective, will result in ambiguity and confusion. Consider the interrogatory in this case as if it were worded as in *Hooper*: "Prior to Keith Stanphill's death, was it reasonably foreseeable that he would commit suicide or act in a self-destructive manner before October 9, 2005?" Jurors would be left to guess as to whom. They might determine, for example, that it was reasonably foreseeable to Stanphill's wife before she left for vacation or to Mr. Poe, the last person to see him alive, and answer in the positive despite believing that it was not reasonably foreseeable to Ortberg as a reasonably careful licensed clinical social worker a week before. They might believe that it was not reasonably foreseeable to most reasonable people and answer in the negative, despite their belief that it should have been foreseeable to Ortberg.

¶ 55    Nor did the interrogatory misstate the law. As the majority states, whether the suicide was reasonably foreseeable is an ultimate fact upon which the parties depend. Whether it was reasonably foreseeable to Ortberg, as a reasonably careful licensed clinical social worker, is indeed an accurate statement of whether her failure to foresee it was legal causation. Jurors heard from many witnesses, all of whom had different levels of interaction and association with the decedent. The interrogatory must be clear that it is asking jurors whether they believe that someone with the information that Ortberg had—not the information that Stanphill's wife, Mr. Poe, or anyone else had—should have reasonably foreseen the suicide. Without personalization to the defendant's point of view, in the context of the court's other instructions and the standard of care applicable to the defendant, ambiguity arises, and the special interrogatory cannot serve its purpose.

¶ 56    In sum, I would find that the special interrogatory given to the jury in this case was objective and in the proper form. I would also reach the second issue and find that the jury's negative response to that interrogatory was clearly and absolutely irreconcilable with its general verdict in favor of the estate. I would thus reverse the appellate court and affirm the trial court.

¶ 57    I respectfully dissent.