2021 IL App (1st) 192499-U

THIRD DIVISION
December 8, 2021

No. 1-19-2499

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| MARTIN McCALLION, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | 17 L 1387 |
| | ) | |
| MICHAEL NEMLICH, | ) | Honorable |
| | ) | James M. Varga, |
| Defendant-Appellee. | ) | Judge Presiding |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Plaintiff's preserved objections to special interrogatory were without merit. Court did not abuse its discretion in allowing some but not all evidence relating to defendant's failure to obtain elevator permit. Court did not abuse discretion or prejudice defendant by limiting cross-examination.

¶ 2    Plaintiff Martin McCallion was seriously injured after an elevator platform he was standing on collapsed. To recover for the injury, he sued the owner of the lift, defendant Michael Nemlich, for premises liability, claiming in part that defendant failed to follow Chicago's elevator permitting requirements.

1

¶ 3      After trial, the jury returned a substantial verdict for plaintiff. But the jury also made findings in special interrogatories that negated several elements of the claim. Based on the special findings, the court entered judgment in defendant's favor. Plaintiff appeals, raising several errors. For the following reasons, we affirm.

¶ 4                                    BACKGROUND

¶ 5       Defendant has owned a Chicago 3-flat for more than 30 years. At the rear of the building is a 2-car garage. At some point around 2004—the testimony was not clear on the dates—he decided to modernize and expand the garage. He hired his friend, a concrete contractor, Michael Gallagher. Through Gallagher, defendant converted the garage's gabled roof/loft space into a complete second story by adding a concrete floor, extending the walls, and topping it with a flat concrete roof. As part of this renovation project, defendant also wanted to add a mechanical lift to the garage, primarily to store a motorcycle. So Gallagher designed the concrete floor so that a lift bed could be raised to the second story.

¶ 6      As for the lift itself, there was competing evidence at trial about how it came to be. Defendant testified that he discussed the plans with Gallagher, who helped design, select the components for, and install the lift. Gallagher, on the other hand, claimed that his contributions were far more limited. He specifically denied selecting components, constructing the lift, or installing electrical components.

¶ 7      It is undisputed, however, that defendant did not hire a licensed elevator contractor to design, fabricate, or install the lift. Instead, he viewed a few lifts in other garages and was referred to a man who owned a welding shop. Defendant could not remember who referred him or the name of this welder. This unnamed welder designed, fabricated, and installed the steel components of the lift in defendant's garage.

¶ 8    According to defendant, he used the lift a couple times a year, without issue, from the time it was installed until 2016. At some point near the end of 2016, he noticed that the lift was making a rubbing or grinding noise. He stopped using the lift and left it in the raised position. Defendant called Gallagher to examine it. Defendant claims he told Gallagher that the lift was making a noise. Gallagher testified that defendant also told him it was "bouncing." On December 16, 2016, Gallagher visited defendant's garage.

¶ 9    When Gallagher decided to look at the lift, he was riding with plaintiff between work sites. Plaintiff was a union concrete carpenter who worked with Gallagher on concrete projects—plaintiff testified that Gallagher was "[his] boss." Like Gallagher, plaintiff was not an elevator mechanic but considered himself to be "mechanically minded." During the ride, Gallagher told plaintiff that he needed to stop by a job between the two work sites. Gallagher testified that he "[p]robably said something along the lines of, I have to stop at a friend of mine's house to look at a lift, you know, let's swing by there." But plaintiff testified that he had no idea what they were doing there and didn't know what was wrong before they arrived at defendant's house.

¶ 10    When Gallagher and plaintiff got to the house, they went up a set of stairs to the second floor of the garage. The two got onto the lift to inspect it. According to plaintiff, "Gallagher told me to check the runners for grease. I walked over, Michael was standing to the left, I was to the right, I looked in the track for grease, basically I stepped on and it dropped." Gallagher remembers it slightly differently:

> "I stepped onto the lift to look at the roller areas, to look at the winch, whatever, and
> [plaintiff] stepped on the lift shortly after I did * * * and I may have said to [defendant],
> you know, [m]ove the lift, whatever. And next thing I recall, [plaintiff] and I were on the
> floor below."

In contrast, defendant claims "[t]he lift lowered its'—normally for two to three feet and then there was a noise and then the lift fell the rest of the way."

¶ 11    From what we know, Gallagher was not seriously injured. But plaintiff was in "pain, a lot of pain." Gallagher removed plaintiff's boot and immediately told defendant to call an ambulance. At the hospital, plaintiff underwent emergency surgery. When he awoke from surgery, the doctors had "put [him] in what is called an external fixator. Everything was crushed so they had to pull it back in line and in shape as best they could."

¶ 12    A few weeks later, he began bleeding from his ankle. At the hospital, "two doctors grabbed the on [*sic*] side of that pin and squeezed with all their life to stop the—to put pressure on it to stop the bleeding." Eventually they stopped it, but another surgery was necessary to fully address the issue.

¶ 13    Plaintiff filed a premises-liability complaint against defendant. Pertinent to this appeal, plaintiff claimed, among other things, that defendant was negligent for failing to obtain an elevator permit before installing the lift in his garage. As the case neared trial, the court initially allowed the claim that defendant failed to obtain a permit to proceed.

¶ 14    At trial, several witnesses testified. As detailed above, plaintiff, Gallagher, and defendant each described their recollection of the events. Plaintiff also called David Schroeder, his expert on the City of Chicago's permitting requirements.

¶ 15    Schroeder was an architect hired to review whether defendant's "lift" fell within the purview of Section 13-32-190 of the Chicago Municipal Code and thus required an elevator permit. Though Schroeder is not a mechanical engineer or elevator mechanic, he testified that defendant's lift "absolutely" fell within the scope of Section 13-32-190. In his opinion, defendant was required to hire a licensed elevator mechanic contractor, the only person qualified under the

ordinance to obtain a permit for the "construction, installation, or alteration" of an elevator. Schroeder opined that "instead of submitting his plans for the lift to the City of Chicago for review and approval, he opted to install the lift without any review for the safety and compliance with the applicable codes."

¶ 16 On cross, Schroeder admitted that "the lack of a piece of paper did not cause [plaintiff's] accident." However, he later explained that the failure to obtain a permit contributed to plaintiff's injuries because "[h]ad the installation been reviewed by the City of Chicago's elevator department, they would have made sure that it was verified to comply with the standards in effect for safety in the city of Chicago." He additionally clarified that "[h]aving a licensed elevator contractor submit the—submit for the permit would ensure that somebody who had been trained in the installation of elevators and knows how elevators work would be involved with the project from start to finish."

¶ 17 Schroeder offered no opinion as to the mechanical cause of the lift's failure.

¶ 18 Aside from these three witnesses, the record appears to suggest that defendant had two experts testify in his defense. We say "appears" because we do not have a transcript of these experts, and plaintiff's brief on appeal does not mention that they testified. Our only solid indication that they testified is from defendant's response in the trial court to plaintiff's post-trial brief. Specific to the permitting issues, this response brief indicates that:

> "Mark Viz, Ph.D., P.E. testified as a mechanical engineering expert for the defense. He testified that the lift pully failed at the time of the accident and offered no opinion that the cause of the lift pulley failure was identifiable by inspection prior to the occurrence. He opined that the lift was not considered an elevator or material lift under the applicable codes and refuted Mr. Schroeder's opinions on that subject."

5

¶ 19    But we cannot verify this testimony because, again, the record on appeal does not contain a transcript of it. (Defendant's response brief on appeal specifically mentions this deficiency; plaintiff's reply brief does not refute or respond to it.)

¶ 20    Near the end of trial, during the instructions conference, the court reversed its position on a portion of the permitting requirements. Plaintiff proposed an issues instruction that included the claims that defendant was negligent when he:

> "b) Installed an elevator/lift in the garage without a permit in violation of the Chicago Building Code;" c) Failed to have the elevator/material lift installed by a licensed elevator mechanical contractor in violation of the Chicago Building Code; and d) Failed to have the elevator/material lift annually inspected in violation of the Chicago Building Code."

¶ 21    The circuit court struck the "b)" instruction about installing the lift without a permit, at which point the following exchange occurred:

> "THE COURT: Why do you need B if you can get in C and D? The permit—All the permits say is you should have a licensed elevator mechanical contractor and it says it should be inspected once a year, right?
>
> [PLAINTIFF'S COUNSEL]: Yes.
>
> THE COURT: Isn't it something like that? So why do we need a permit to show the defense is a bad guy?"

¶ 22    Later, plaintiff also tendered IPI 60.01, an instruction on the effect of violating a statute, ordinance, or administrative rule. The court refused this instruction: "No. I ruled I am not giving them the permits. I ruled on this yesterday."

¶ 23 Along with the instructions, the court tendered two special interrogatories to the jury. Number 1 read: "Did the defendant, Michael Nemlich, know, or in the exercise of ordinary care should he have known, of both the condition and the risk?" Plaintiff's counsel objected that the interrogatory was "vague and ambiguous * * * and this doesn't test the verdict." With some modifications, the trial court allowed the special interrogatory.

¶ 24 Defendant's second special interrogatory read: "Was there negligence on the part of Defendant, Michael Nemlich, that was a proximate cause of Martin McCallion's injuries?" Plaintiff's counsel objected without explanation. The court asked plaintiff's counsel to "state your objection for the record." After this specific prompt, counsel objected on the basis that it was "in the instruction" and "I don't believe it tests the verdict." The court ultimately allowed this second special interrogatory as well.

¶ 25 After the instructions conference, the case went to closing arguments. A few minutes into plaintiff's closing, counsel attempted to discuss the elevator permit:

"[Plaintiff's counsel]: Now, not only did he have a general duty under the law, as all property owners have, to maintain his property in a safe condition; he had an additional duty under the City of Chicago Building Code to obtain a permit for the installation in his garage.

[Defendant's counsel]: Judge, objection.

THE COURT: Sustained.

[Plaintiff's counsel]: And the evidence that you have heard in this case—

[Defendant's counsel]: Objection.

THE COURT: Is this permit stuff?

[Plaintiff's counsel]: Yeah

7

THE COURT: Sustained.

[Plaintiff's counsel]: Judge, this has to do with the getting a licensed contractor to— we talked about that as part of the instruction.

THE COURT: Okay. Elevator permit is required. Yeah, but permit is not negligence. So I don't know what you can do with that document.

[Plaintiff's counsel]: Well, I am talking about the requirement that a licensed elevator mechanic—

THE COURT: No. I think what you can argue is that he did not have a licensed elevator mechanic to do the work. That was my ruling. Not permits. You won't see permits in the issues instructions, okay? Now, you may see the licensed contractor, but not permits. It's not listed in the issues instructions.

[Plaintiff's counsel]: So I may not show this to the jury?

THE COURT: No. You can argue, though, a licensed contractor.

[Plaintiff's counsel]: So you have heard the testimony in this case and you have heard testimony from plaintiff's architectural expert David Schroeder who testified as to what the requirements were under the City of Chicago Building Code. The City's building ordinance with regard to elevators—

[Defendant's counsel]: Objection.

THE COURT: What?

[Defendant's counsel]: The duty.

THE COURT: The duty? You mean the statute?

[Defendant's counsel]: He is arguing statute.

THE COURT: Pardon me?

8

[Defendant's counsel]: He is arguing that Schroeder's testimony poses a duty.

THE COURT: Testimony does not create a duty. It is sustained.

[Plaintiff's counsel]: You heard—I am not suggesting that Mr. Schroeder's testimony creates a duty. I am suggesting to you that Mr. Schroeder testified here under oath about what Mr. Nemlich's duty was under the City of Chicago Building Code.

[Defendant's counsel]: Same objection, Judge.

THE COURT: The evidence of negligence.

[Defendant's counsel]: Building code.

THE COURT: Well, the code, I think you can use a violation of a building code to establish evidence of negligence. Is that where you are going?

[Plaintiff's counsel]: Yes, Judge.

THE COURT: It can't be a duty, but it certainly can be used as evidence of negligence. So, okay, sustained. But moving into that area, you can go in that area."

¶ 26    Near the end of the closing argument, plaintiff's attorney specifically addressed the special interrogatories. Regarding the first—whether defendant knew or should have known of "both the condition and the risk"—counsel told the jury that "I am going to suggest to you that you answer this interrogatory yes" and gave his reasons why. As for the second special interrogatory—whether defendant's negligence was a proximate cause of plaintiff's injury—he likewise said: "I am going to suggest to you that you answer that interrogatory yes as well" and explained what he thought the evidence showed.

¶ 27    After deliberation, the jury returned an approximately $1,000,000 general verdict in plaintiff's favor, which was reduced by a finding of 50% contributory negligence. But it also

answered "No" to both special interrogatories. As a result, the court entered judgment in favor of defendant.

¶ 28    Plaintiff filed a post-trial motion. In it, he argued that the interrogatories were vague, ambiguous, and did not test the verdict. He also argued for the first time that the special interrogatories were improperly "compound." Together, he argued that these errors in the interrogatories clearly confused the jury. To support this, counsel included affidavits from 9 of the jurors, who attested they were confused by the special interrogatory and that they found the plaintiff had met their burden of proof on negligence and proximate cause. He further argued that the court erred in limiting cross-examination, refusing to give IPI (Civil) No. 60.01, and effectively "extinguishing" his ordinance-violation claim.

¶ 29    In denying the post-trial motion, the court specifically refused to consider the juror affidavits and struck them. Plaintiff timely appeals.

¶ 30                                  ANALYSIS

¶ 31    On appeal, plaintiff argues the court erred by "extinguishing" his claim arising out of the elevator ordinance, refusing cross examination on the grounds of subsequent remedial measures, and tendering the special interrogatories.

¶ 32                         I. Special Interrogatories

¶ 33    Though it is his final argument, we begin with plaintiff's challenge to the special interrogatories, because if we agree with plaintiff that both special interrogatories were improper, the remedy would be to reinstate the general verdict in plaintiff's favor, a remedy that would moot his other claims of error. See *Blue v. Environmental Engineering, Inc*, 345 Ill. App. 3d 455 (2003) (reinstating general verdict after finding special interrogatories should not have been

given), *aff'd*, 215 Ill. 2d 78, 114 (2005). Our review of the propriety of special interrogatories is *de novo*. *Stanphill v. Ortberg*, 2018 IL 122974, ¶ 31.

¶ 34    The jury here rendered a general verdict, but under the law in existence at the time of trial, a party was entitled to submit to the jury a special interrogatory—that is, to submit a written question to the jury to "find specifically upon any material question or questions of fact." 735 ILCS 5/2-1108 (West 2018). If the special finding of fact made by the jury is inconsistent with the general verdict, the special finding controls, "and the court may enter judgment accordingly." *Id*.

¶ 35    A special interrogatory guards the integrity of the general verdict by testing it against the jury's determination as to one or more specific issues of ultimate fact. *Simmons v. Garces*, 198 Ill. 2d 541, 556 (2002). It focuses the jury on a critical issue in the case and thus serves as a "check on the propriety of the general verdict." *Jacobs v. Yellow Cab Affiliation, Inc.*, 2017 IL App (1st) 151107, ¶ 123.

¶ 36    But the special interrogatory must be in proper form. For one, it must "relate[] to an ultimate issue of fact upon which the rights of the parties depend." *Simmons*, 198 Ill. 2d at 563. It should consist of a single direct question; it should not be prejudicial, misleading, or confusing; and where possible, it should use the same language or terms as the tendered instructions. *Id*.; see *Smart v. City of Chicago*, 2013 IL App (1st) 120901, ¶ 32.

¶ 37    And most significantly for our purposes, an answer to the special interrogatory that favors the defendant must be "inconsistent with some general verdict that might be returned" in the plaintiff's favor. *Simmons*, 198 Ill. 2d at 563. It must be " 'clearly and absolutely irreconcilable with the general verdict.' " *Id*. at 556 (quoting *Powell v. State Farm Fire & Casualty Co.*, 243 Ill.

11

App. 3d 577, 581 (1993)). If the special finding can be reasonably construed with the general verdict, it is not "absolutely irreconcilable." *Id*. (quoting *Powell*, 243 Ill. App. 3d at 581).

¶ 38    We begin with the special interrogatory that asked: "Was there negligence on the part of Defendant, Michael Nemlich that was a proximate cause of Martin McCallion's injuries?" When that interrogatory was proffered at trial, just before closing argument, the court asked plaintiff's counsel to state his objection, to which counsel replied: "I am objecting to the special interrogatory concerning proximate cause. It's in the instruction, and I don't believe it tests the verdict."

¶ 39    The trial court initially thought the special interrogatory was referring to negligence on the part of *plaintiff*—a contributory-negligence interrogatory—and balked. The court quickly recognized its error and concluded, contrary to plaintiff's objection, that the special interrogatory did, indeed, test the verdict, as it related "directly to proposition 6" and would "knock out proposition 6." The court was referencing the sixth proposition contained in the Illinois Pattern Instruction (IPI) that would be submitted to the jury regarding the elements plaintiff had to prove for negligence, namely: "In order to recover damages, the plaintiff has the burden of proving: *** Sixth, the defendant's negligence was a proximate cause of the plaintiff's injury." See IPI Civil No. 120.08.

¶ 40    On appeal, plaintiff repeats this objection that the special interrogatory did not test the verdict. But we agree with the trial court that a negative answer to the question, "Was there negligence on the part of Defendant, Michael Nemlich that was a proximate cause of Martin McCallion's injuries?" would be utterly inconsistent with a general verdict in favor of plaintiff. It is fundamental that, to prevail in a premises-liability claim, a plaintiff must show not only that defendant owed a duty of care and breached that duty—the breach of duty being negligence—but

that the defendant's negligence proximately caused injury to the plaintiff. *Garcia v. Goetz*, 2018 IL App (1st) 172204, ¶ 31; see also *Simmons*, 198 Ill. 2d at 556. If, as the jury found here in the special interrogatory, there was an absence of proximate cause between defendant's conduct and plaintiff's injuries, the only possible verdict under the law could be one for the defendant.

¶ 41 On appeal, plaintiff also argues that this special interrogatory was compound—it asked more than one question in the single sentence. While we have at times approved of special interrogatories that combined the concepts of negligence and proximate cause in a single question, in other instances we have found them improperly compound; the particular wording and circumstances have dictated the result. See, *e.g.*, *Jacobs*, 2017 IL App (1st) 151107, ¶¶ 124-126; *Smart v. City of Chicago*, 2013 IL App (1st) 120901, ¶ 38; *Santos v. Chicago Transit Authority*, 198 Ill. App. 3d 866, 869–70 (1990).

¶ 42 But whatever merit there may be to the claim that the special interrogatory here was compound, we cannot consider it, because that objection was not raised at trial. It was raised in plaintiff's post-trial motion, but not during the instructions conference. "It is 'beyond dispute that a failure to specifically object to a special interrogatory when proffered at the instructions conference will ordinarily waive any claim of error in the giving of that special interrogatory.' " *Price v. City of Chicago*, 2018 IL App (1st) 161599, ¶ 22 (quoting *La Pook v. City of Chicago*, 211 Ill. App. 3d 856, 864 (1991)). A general objection is not sufficient to preserve a specific claim of error to the form of an interrogatory. See *Silverman v. First Federal Savings and Loan Ass'n of Chicago*, 94 Ill. App. 3d 274, 280 (1981) (plaintiff waived objection to form of interrogatory by making only general objection to it).

¶ 43 At the conference on the special interrogatories, the court directly solicited any objections plaintiff might have to this special interrogatory. As noted above, he raised only two—that this

question was already "in the instruction," and the interrogatory did not test the verdict. He thus forfeited any claim that the special interrogatory was compound.

¶ 44    Forfeiture may seem like harsh medicine, but we must honor it out of fairness to defendant and the court. A contemporaneous objection would have given the court an opportunity to rule on the objection and, just as importantly, would have given defendant the opportunity to *cure* any error. A claim that a special interrogatory is compound could be easily fixed by simply breaking the one compound interrogatory into two individual ones. Allowing that objection to go unmentioned at trial, only to be raised after the trial has ended, would unfairly reward plaintiff for his silence and punish defendant for something beyond his control. We thus will not further consider this objection.

¶ 45    Plaintiff also argues on appeal that this special interrogatory was confusing. It is tempting to deem that objection forfeited for the same reason—it was not raised at trial. But we will consider the merits of that objection, because the principal basis for plaintiff's claim of confusion is the juror affidavits plaintiff produced post-trial. Obviously, plaintiff had no access to those affidavits, nor any reason to solicit them, at the time these interrogatories were debated before closing arguments.

¶ 46    Before getting to those affidavits, we would make two preliminary notes. First, as noted above, the special interrogatory tracked the language of the instruction submitted to the jury on the elements plaintiff had to prove on his negligence claim. See IPI (Civil) No. 120.08. And both "negligence" and "proximate cause" were defined in those instructions. See IPI (Civil) No. 10.01 (definition of "negligence"); IPI (Civil) No. 15.01 ("proximate cause"). The special interrogatory must be considered in conjunction with the corresponding jury instructions the jury received. *Simmons*, 198 Ill. 2d at 563; *La Pook*, 211 Ill. App. 3d at 866 (a "special interrogatory should be

read together with the jury instructions to determine how the interrogatory was understood by the jury and whether there was any confusion."). Plaintiff is hard-pressed to claim confusion when the language adhered so closely to the IPI instructions on which the jury based its general verdict.

¶ 47    Second, the mere fact that a finding in a special interrogatory conflicted with the general verdict is not evidence, itself, of jury confusion. *Simmons*, 198 Ill. 2d at 563-64 ("A trial court may not conclude from the mere fact of inconsistency between a general verdict and a special interrogatory that the jury was confused by the interrogatory.").

¶ 48    That brings us to the juror affidavits. As noted briefly above, plaintiff obtained affidavits from 9 of the 12 jurors after the trial ended. The affidavits were typewritten, signed, and notarized, all purporting to be based on the affiant's personal knowledge. They each bore the caption of the case and were dated in August 2019.  Each of them contained the following language:

> "2. I found that plaintiff met his burden of proof, that defendant was guilty of negligence, and that plaintiff was entitled to damages;
>
> 3. I found that the conduct of the defendant was a proximate cause of plaintiff's injuries;
>
> 4. I signed Verdict Form B attached hereto;
>
> 5. I was confused by the special interrogatories."

¶ 49    Some of the affidavits contained this additional language: "I was not informed that we could submit questions to the judge."

¶ 50    The circuit court struck these affidavits, and properly so. The case law is well settled that juror affidavits cannot be used to impeach a verdict generally. As our supreme court has written:

" 'It is well established in this State, and almost universally recognized, that a jury may not impeach its verdict by affidavit or testimony which shows the motive, method, or process by which the verdict was reached. [Citations.] Thus, it is impermissible to challenge a verdict following the jury's discharge by explaining the basis for the jury's findings [citation] or by asserting that the jury was mistaken.' " *Redmond v. Socha*, 216 Ill. 2d 622, 635 (2005) (quoting *Chalmers v. City of Chicago,* 88 Ill.2d 532, 534 (1982)).

¶ 51      The reasons for this rule, among others, include protecting the finality of judgments and the privacy of the jury room, as well as protecting jurors from being " ' "harrassed and beset by the defeated party" ' " post-trial in an effort to upset an unfavorable outcome. *Id*. at 636 (quoting *People v. Pitsonbarger*, 205 Ill. 2d 444, 468 (2002), in turn quoting *Tanner v. United States*, 483 U.S. 107, 120 (1987)).

¶ 52      Plaintiff concedes that he may not use juror affidavits to impeach the verdict but insists that, instead, he is merely using them to show the confusing nature of the interrogatories. He cites no authority for this distinction, and we can glean none. The critical point here, as far as we can tell, is that the jurors intended to return a general verdict for plaintiff—as they did—and they did not realize that their negative answer to the special interrogatory would negate that general verdict. But that is not a basis to upset the special findings and the ultimate judgment the trial court entered in defendant's favor.

¶ 53      Indeed, at the time this trial occurred, it would have been improper for the jury to know the effect of its special findings on the general verdict. See *Lozado v. City of Chicago*, 279 Ill. App. 3d 285, 289 (1996) ("It is reversible error to advise the jury that the special interrogatory and general verdict should conform or to discuss the legal effect of the answer or how it impacts

16

the general verdict."); see *Pister v. Matrix Serv. Indus. Contractors, Inc.*, 2013 IL App (4th) 120781, ¶ 84 (error to inform jury it must harmonize special finding with general verdict).

¶ 54    We recognize, as plaintiff notes, that state law was amended in 2019; under the current version of the statute, the jury may be informed of the effect of a special finding on the general verdict. Compare 735 ILCS 5/2-1108 (West 2018) (pre-amendment) *with* 735 ILCS 5/2-1108 (West 2020) (for trials commencing on or after January 1, 2020, parties may explain to jury "what may result if the general verdict is inconsistent with any special finding."). But the earlier version of the statute was in force at the time of his trial in July 2019, and thus the new version of the statute is of no consequence here.

¶ 55    For the reasons given, we uphold the giving of this special interrogatory, asking whether defendant's negligence was a proximate cause of plaintiff's injuries, over the properly preserved objections raised on appeal. As such, there is no need to consider the propriety of the other special interrogatory. The negative answers to this special interrogatory were enough to nullify the general verdict and require the entry of judgment in favor of defendant.

¶ 56    Because we uphold the special interrogatory, we next consider plaintiff's additional arguments that various rulings by the trial court were improper and prejudicial to him.

¶ 57                    II. "Extinguishing" Permit-Ordinance Claim

¶ 58    First, plaintiff argues that the trial court effectively "extinguished" his claim regarding defendant's violation of the elevator-permit ordinance.  He relies on the combination of a few rulings: refusing to include defendant's failure to obtain a permit in the issues instruction on negligent conduct; refusing to give IPI (Civil) No. 60.01; and sustaining objections during closing arguments. We review each of these rulings for an abuse of discretion. See *Schultz v.*

17

*Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002) (giving of jury instruction); *Simmons*, 198 Ill. 2d at 571 (rulings on objections in closing argument).

¶ 59    At the relevant times, the Chicago Municipal Code provided:

> "Before proceeding with the construction, installation, or alteration of any elevator * * *, application for a permit for such construction, installation, or alteration shall be submitted to the building commission either by the owner or agent of the building, or of the premises on which such equipment is to be installed. * * * No permit shall be issued for such work except to an elevator mechanic contractor duly registered under the [Municipal Code of Chicago]." Chicago Municipal Code § 13-32-190 (repealed by Coun. J. 4-10-19, p. 100029, Art. XXI, § 11).

¶ 60    Plaintiff correctly notes that the violation of an ordinance designed to protect life or property may be *prima facie* evidence of negligence. See *Kalata v. Anheuser-Busch Companies, Inc.*, 144 Ill. 2d 425, 434 (1991). He complains that, by not allowing him to accuse defendant of negligence for not obtaining a permit, the court effectively eviscerated this entire theory of liability. But that is not an accurate characterization of the record. The trial court allowed plaintiff to argue that defendant was liable *both* in (i) failing to have the lift installed by a licensed elevator contractor, as required by this ordinance, and in (ii) failing to have the lift inspected annually, in violation of the ordinance. And the jury received instructions on each theory as well:

> "In order to recover damages, the plaintiff has the burden of proving:
>
> ***
>
> Fourth, the defendant was negligent in one or more of the following ways: a) Failed to have the elevator/material lift installed by a licensed elevator mechanical

contractor in violation of the Chicago Building/Municipal Code; b) Failed to have the elevator/material lift annually inspected in violation of the Chicago Building/Municipal Code ***."

¶ 61    So if the jury did not hear from plaintiff in closing argument about the failure to obtain a permit *per se*, plaintiff was allowed to and did argue about the things that a permit would have brought about—the use of a licensed contractor to install the lift and annual inspections of the lift thereafter. That, more than the issuance of a piece of paper, was the substance of the matter, as even plaintiff's expert said: "The lack of a piece of paper did not cause this accident." Rather, it was what the permitting process would have required: "Having a licensed elevator contractor submit the—submit for permit would ensure that somebody who had been trained in the installation of elevators and knows how elevators work would be involved with the project from start to finish."

¶ 62    We should put all this in context, too. The testimony showed that this lift was installed sometime between 2002 and 2004, anywhere from 12 to 14 years before the accident in 2016, and that it operated without incident before it began to make grinding noises just before the accident in question. And as defendant notes, plaintiff put forth no evidence as to what, precisely, malfunctioned on this lift. No evidence as to negligent installation versus wear-and-tear, for example.

¶ 63    There was no evidence, that is, that there was anything wrong with the initial installation of the lift over a decade earlier—that the (non-permitted) installation of the lift had anything to do with this accident. And while it is certainly true that the violation of a municipal safety ordinance can be *prima facie* evidence of negligence, a plaintiff still must show that the ordinance violation was a proximate cause of his injury. See *Kalata*, 144 Ill. 2d at 434.

¶ 64     The court could have reasonably concluded that, absent testimony linking the initial installation (non-permitted as it may have been) to the accident, it would be misleading if not outright wrong to peg the failure to obtain a permit, itself, as a possible basis of liability. But at the same time, the court allowed plaintiff to argue about all the accompanying benefits of a permit—the use of a licensed contractor and, more importantly in our view, the annual follow-up inspections by city inspectors—that might have prevented this accident. And plaintiff was able to cite the municipal ordinance while doing so.

¶ 65     So we would be hard-pressed to find an abuse of discretion here—that is, to find that no reasonable person would adopt the view taken by the trial court. And even were we to deem the court's ruling erroneous, it would not be reversible error, in any event. Plaintiff suffered no prejudice from how the court handled this issue, as plaintiff was allowed to make all the substantive arguments on the questions of negligence and proximate causation regardless. See *Parsons v. Norfolk South Railway Co.*, 2017 IL App (1st) 161384, ¶ 33 (" 'Where it appears that an error did not affect the outcome below, or where the court can see from the entire record that no injury has been done, the judgment *** will not be disturbed.' ") (quoting *J.L. Simmons Co. v. Firestone Tire & Rubber Co.*, 108 Ill. 2d 106, 115 (1985)). In either event, we find no basis to reverse the judgment on this ground.

¶ 66                              III. Cross-Examination on Safety Features

¶ 67     Finally, plaintiff argues that the court abused its discretion when it refused to allow his counsel to cross-examine defendant regarding certain safety features of the lift, namely the safety chain and the safety cross rod (which we will shorthand as the "safety rod and chain"). The trial court has wide discretion in regulating cross-examination; we will not find reversible error

20

"absent an abuse of that discretion resulting in manifest prejudice." *Bauer ex rel. Bauer v. Memorial Hospital*, 377 Ill. App. 3d 895, 915 (2007).

¶ 68    We start with some needed context. Before trial, defendant moved to bar any evidence of subsequent remedial measures. Defense counsel said at the time that it was his "understanding" that the safety rod and chain depicted in photographs of the lift were installed after the accident and thus constituted a subsequent remedial measure. Plaintiff's counsel indicated that it was not clear to him, after reviewing the photograph, that they were installed afterward. Defense counsel said that, even if they were installed at the time of the accident, they were not a relevant consideration, because the lift could not move when the safety rod and chain were utilized, and it would be impossible for Gallagher to check out the lift while it was immobilized.  It was a safety measure, in other words, to the extent it did not allow the lift to move at all, as opposed to the lift moving safely.

¶ 69    Plaintiff's counsel replied that if these safety features were *not* subsequent remedial measures, they would be fair game for testimony. The trial court reserved ruling at the time.

¶ 70    But when plaintiff called defendant as an adverse witness in plaintiff's case-in-chief, plaintiff did not inquire about the safety rod and chain, before the jury or outside the jury's presence. Nor, as best we can tell, was the safety rod and chain part of any legal theory plaintiff ever developed for trial—certainly nothing his expert discussed.

¶ 71    When defendant was recalled as the last witness in the case, during defendant's case-in-chief, defendant testified on direct that the photograph of the lift entered into evidence—which included the safety rod and chain—was a true and accurate depiction of the lift as it appeared at the time of the accident (with one exception not relevant here). At that point, about to begin cross-examination, plaintiff's counsel told the court that he wanted to question defendant about

the safety rod and chain. Given the defendant's testimony, he argued, the safety rod and chain was *not* a subsequent remedial measure but was part of the lift at the time of the accident.

¶ 72    The trial court refused to allow plaintiff to do so, for two reasons. One, it was a subsequent remedial measure. But second and more emphatically, the court expressed exasperation at what could be an entirely new theory of liability coming in at the end of the trial:

> "THE COURT: Nobody's even talked about it this whole trial. We are almost done. We got around that because I guess the argument is going to be when it was falling, if they were on it, they could have stopped the fall.
>
> [Plaintiff's counsel]: Sure. But there has been no testimony in the case one way or the other with regard to these and I stayed away from it.
>
> THE COURT: That's my point. So why do we need it now?
>
> [Plaintiff's counsel]: Well, because now the door is open. Now through the witness's own—
>
> THE COURT: No. I am done. I am not going to go there, okay? The whole—I did this case. We have talked about it. *** Because not one witness talked about it. Now it is coming back. No lay witness, no party, no expert. Nobody ever talked about it.
>
> [Plaintiff's counsel]: Well, except for the defendant who can talk about it.
>
> [Defendant's counsel]: He didn't talk.
>
> THE COURT: The whole trial nobody talked about it, okay? So that's what we are going to do. It is coming back. It is my general memory and it's pretty accurate. Okay. Let's try the case we had discovery on it. No expert addressed it. Blah, blah, blah. And so he asked that. It was a bad question because it was waiting to open the door. But I

22

don't think it—okay. So that question in and of itself is insufficient to open the door to put in subsequent remedial measures.

\*\*\*

THE COURT: The answer to the question, I thought somebody said that—I guess it is [defense counsel] because it is [his] party, that this was put on afterwards. Was it on there on the day of the occurrence?

[Defendant's counsel]: No. It is a post-occurrence—that's my motion in limine.

THE COURT: I keep redoing things. I don't like to keep redoing. That's what I thought it was. And we had a motion on it, right?

[Plaintiff's counsel]: I did. And it was suggested only by [defense counsel] that it was put on after the occurrence. There has been no testimony.

THE COURT: Did anybody ask him at his dep, the defendant?

[Defendant's counsel]: No.

THE COURT: You never asked him in his dep so the whole case was discovered and tried without—

[Plaintiff's counsel]: Are you limited to examination at trial based on the four corners of a deposition?

THE COURT: He is going to testify that they were put on afterward. We were told that by his lawyer.

[Plaintiff's counsel]: Judge, he just indicated otherwise. You had a ruling on this."

¶ 73    These portions of an even longer exchange demonstrate two points to us. First, plaintiff was and is correct that, in light of defendant's testimony, it appeared that the safety rod and chain

were part of the lift at the time of the accident. So, by definition, the safety rod and chain were *not* subsequent remedial measures but features that were on the lift all along.

¶ 74    But second and more important was the other basis raised by the trial court—that this entire discussion was coming so late in the game, near the end of the trial and long after the close of plaintiff's case-in-chief. Plaintiff's counsel explained to the court that he "stayed away" from discussing the safety rod and chain because he viewed it as a subsequent remedial measure, based on defense counsel's "understanding" at the conference on motions *in limine*. But as the trial court noted, though plaintiff's counsel claimed to have just learned about the safety rod and chain at that late moment in the trial, plaintiff clearly had the opportunity to ask those kinds of questions in discovery, through written interrogatories or at defendant's discovery deposition. Fact and expert discovery are designed specifically to avoid these last-minute revelations.

¶ 75    Nor did anything prevent plaintiff from questioning defendant on this topic during plaintiff's case-in-chief, when defendant was on the witness stand. And none of this changes the fact that plaintiff never, at any time before or during the trial, made any mention of the safety rod and chain having any causal relationship to this accident.

¶ 76    The trial court was well within its discretion to put a stop to a new, last-minute line of inquiry and potentially an entire new legal theory never disclosed to defendant. This is precisely what we mean by the wide latitude we give trial courts in regulating testimony. Arguably, the questions plaintiff wanted to ask about the safety rod and chain were beyond the scope of defendant's direct testimony, and we could affirm on that basis alone, even if it was not the one on which the trial court relied. See *Tillman v. Pritzker*, 2021 IL 126387, ¶ 24.

¶ 77    But even if defendant's authentication of the photograph did, as plaintiff argued, "open the door" to this new line of questioning, it was a line of questioning far afield of anything

24

plaintiff had offered up to that point, as the trial was coming to an end. And plaintiff had ample opportunity to "open that door" himself in his case-in-chief, if not long before the trial began during discovery. We cannot say that the trial court's judgment in this regard was unreasonable or arbitrary in the least. We find no basis for error here and certainly nothing that would rise to the level of "manifest prejudice." *Bauer*, 377 Ill. App. 3d at 915.

¶ 78                                  CONCLUSION

¶ 79    The judgment of the circuit court is affirmed.

¶ 80    Affirmed.